RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0303p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

IBRAHIM PARLAK,

     *Petitioner-Appellant,*

     *v.*

ERIC H. HOLDER, JR.,

     *Respondent-Appellee.*

No. 05-4488

On Petition for Review from an Order of the
Board of Immigration Appeals.
No. A71 803 930.

Argued: October 22, 2007

Decided and Filed: August 24, 2009

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David S. Foster, LATHAM & WATKINS, Chicago, Illinois, for Petitioner. Christopher C. Fuller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** David S. Foster, John J. Marhoefer, LATHAM & WATKINS, Chicago, Illinois, for Petitioner. Douglas E. Ginsburg, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

     GIBBONS, J., delivered the opinion of the court, in which SUTTON, J., joined. MARTIN, J. (pp. 19-33), delivered a separate dissenting opinion.

_____

**OPINION**

_____

     JULIA SMITH GIBBONS, Circuit Judge. Petitioner Ibrahim Parlak seeks review of the Board of Immigration Appeals' ("BIA") decision affirming the decision of the immigration judge ("IJ") ordering Parlak's removal from the United States pursuant to various provisions of the Immigration and Naturalization Act ("INA"). Specifically, Parlak

argues that the BIA erred by: (1) determining that Parlak was removable for fraud or willful misrepresentation pursuant to 8 U.S.C. § 1182(a)(6)(C)(i); (2) determining that Parlak was removable for engaging in terrorist activity pursuant to 8 U.S.C. § 1182(a)(3)(B)(i); (3) determining that Parlak's removal could not be withheld because he persecuted others and thus lacked refugee status under 8 U.S.C. § 1101(a)(42)(A), rendering him ineligible for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3); (4) failing to address properly the IJ's reliance on allegedly torture- induced evidence; and (5) denying Parlak's application for a grant of deferral of removal under the Convention Against Torture ("CAT").

I.

Parlak, a native and citizen of Turkey, entered the United States in 1991. He applied for asylum, alleging that Turkish officials persecuted him because of his leading role in the Kurdish freedom movement. In his application he indicated that he was a "leading member of ERNK, which had close ties to the PKK." ERNK refers to the National Liberation Front of Kurdistan, and PKK is the Kurdistan Workers Party. A narrative statement included with the application related political involvement since 1975 (when Parlak would have been thirteen years old) and periods of police custody associated with his political activities during which Parlak was beaten and tortured. The narrative continued with the following statements. Parlak fled to Germany in 1980, where he continued his political activities. When he sought extension of his passport, Turkish officials refused, telling him he was wanted by the Turkish police and should return to Turkey. He therefore used a false passport. In 1987 he went to Syria and then to Lebanon to join the PKK. He remained in a PKK camp in Lebanon for eight months. He then returned to Syria and attempted an illegal return to Turkey. His effort to cross the border on May 21, 1988, with a dozen friends was unsuccessful; he and his friends were met with gunfire and shot back. On July 1, 1988, Parlak and seven friends successfully crossed the border from Syria into Turkey. They conducted political activities promoting Kurdish freedom. Turkish soldiers attacked on more than one occasion; various friends disappeared or were killed or injured. On October 29, 1988, Parlak was arrested and tortured and given a death sentence.[1] His family paid a bribe

___

[1]This sentence was apparently soon reduced to four years and two months, a fact not included in the asylum application. An appeal by the prosecution followed, a fact also omitted from the asylum application. Later, in 2004, Parlak was apparently resentenced on this charge to six years.

for his release. In 1991 a policeman told him that his file would be reopened and "they will be looking for [him]." He left the country with a false passport. Based on this application, Parlak was granted asylum in the United States.

In 1994 Parlak successfully applied for an adjustment of status to lawful permanent resident, and in 1998 he applied for naturalization. He did not mention the 1988 arrest and conviction referred to in his asylum application in either the 1994 or 1998 applications and checked "no" in response to questions asking whether he had ever been arrested, charged, or convicted for breaking any law. Parlak's naturalization application was denied, apparently due to an outstanding 1995 Turkish arrest warrant and the fact that the PKK had been designated a terrorist organization in 1997.

Parlak was then charged with being removable at the time of his adjustment of status due to false statements made on his application for adjustment of status, specifically, the denial of an arrest, charge, or conviction and the denial of lending support to terrorist activities. Additional charges were later added, which included allegations of terrorist activity between 1985 and 1988. The terrorist activities alleged included organizing ERNK events that collected money for the PKK, receiving firearms training from the PKK in Lebanon, and actions associated with the 1988 efforts to enter Turkey from Syria. Parlak was alleged to have exchanged gunfire in the May 21 incident, resulting in the death of two Turkish soldiers, and to have dropped a grenade on that same occasion. The charges referred to a March 2004 Turkish conviction at which the death of the two soldiers was imputed to Parlak. Parlak was also alleged to have transported firearms and explosives into Turkey about June 1, 1988.[2] The IJ conducted a hearing and ruled against Parlak on all charges. The BIA affirmed most of the IJ's rulings[3] but vacated the IJ's finding that Parlak is an alien convicted of an aggravated felony. Parlak petitioned for review of the BIA decision in this court.

---

[2]Other additional charges alleged commission of murder and a crime of violence after admission, referring to the 2004 conviction. This 2004 conviction was apparently a resentencing for the conviction obtained prior to Parlak's departure from Turkey and based on the May 21, 1988, incident.

[3]The BIA did not affirm the findings of commission of murder and a crime of violence after admission.

## II.

This court reviews only the decision of the BIA. *See Anssari-Gharachedaghy v. INS*, 246 F.3d 512, 513 (6th Cir. 2000). But "[w]here the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzalez*, 408 F.3d 275, 282-83 (6th Cir. 2005).

We generally review the BIA's legal conclusions *de novo,* but we "defer to the BIA's reasonable interpretations of the INA." *See Patel v. Gonzalez*, 432 F.3d 685, 692 (6th Cir. 2005). We review factual findings under a substantial evidence standard "in which we uphold a BIA determination as long as it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (quoting *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992)). "[U]nless any reasonable adjudicator would be compelled to conclude to the contrary," the BIA's findings of fact are "conclusive." 8 U.S.C. § 1252 (b)(4)(B).

## III.

We turn first to the BIA's ruling that Parlak was removable because he made material misrepresentations in his applications for adjustment of status and naturalization. Parlak argues that in finding him removable pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), which makes any alien removable, "who, by fraud or willfully misrepresenting a material fact . . . sought to procure . . . a benefit under the [INA]," the BIA applied the incorrect legal standard. After the BIA's ruling, this court decided *Singh v. Gonzalez*, 451 F.3d 400 (6th Cir. 2006). Parlak argues that *Singh* requires the government to show "an intent to deceive" to establish fraud *or* willful misrepresentation of a material fact under 8 U.S.C. § 1182(a)(6)(C)(i). We review this issue of law *de novo*, while "defer[ring] to the BIA's reasonable interpretations of the INA." *See Patel*, 432 F.3d at 692.

A.

As an initial matter, the government contends that Parlak has waived this argument by not exhausting his administrative remedies pursuant to 8 U.S.C. § 1252(d)(1). Section 1252(d)(1) provides for appellate review of a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right . . . ." This exhaustion requirement is designed to "ensure that the . . . agency responsible for construing and applying the immigration laws . . . has had a full opportunity to consider a petitioner's claims . . . ." *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004) (quoting *Theodoropoulos v. INS*, 358 F.3d 162, 171 (2d Cir. 2004)).

*Singh* was not decided until after the BIA had already considered Parlak's claims and issued its decision, so presumably the government contends that Parlak should have filed a motion to reconsider with the BIA. But "[s]uch motions, as a general rule, need not be filed to exhaust administrative remedies." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal citation omitted). Therefore, we will address the merits of Parlak's argument that the BIA applied the wrong legal standard in finding Parlak removable pursuant to § 1182(a)(6)(C)(i).

B.

The BIA affirmed the IJ's finding that Parlak was removable pursuant to § 1182(a)(6)(C)(i) for his willful misrepresentation. The IJ interpreted § 1182(a)(6)(C)(i) as requiring that a willful misrepresentation be "deliberate and voluntary," but need not include an "intent to deceive." Parlak contends that *Singh* held that fraud *or* willful misrepresentation pursuant to § 1182(a)(6)(C)(i) requires a finding of an "intent to deceive." But *Singh* does not go so far.

Other courts of appeals and the BIA have consistently held that § 1182(a)(6)(C)(i) contains two alternative bases for removability: (1) fraud; or (2) willful misrepresentation of a material fact. *See Mwongera v. INS*, 187 F.3d 323, 330 (3rd Cir. 1999); *Witter v. INS*, 113 F.3d 549, 554 (5th Cir. 1997); *Matter of Kai Hing Hui*, 15 I & N Dec. 288, 289-90 (BIA 1975). While fraud requires an intent to deceive,

willful misrepresentation of a material fact does not. *See Mwongera*, 187 F.3d at 330; *Forbes v. INS,* 48 F.3d 439, 442 (9th Cir. 1995); *In re Tijam*, 22 I & N Dec. 408, 424-25 (BIA 1998) (concurring and dissenting op.) ("Fraud requires that the respondent know the falsity of his or her statement, intend to deceive the Government official, and succeed in this deception," whereas for a "misrepresentation" "a specific intent to deceive is not necessary."). In *Mwongera*, upon which the IJ in this case relied, the Third Circuit confirmed this dichotomy while rejecting an argument similar to Parlak's:

> [W]e reject Mwongera's contention that the INS is required to show an intent to deceive in order to satisfy the statute. To the contrary, the INS must show that the alien obtained a visa by fraud (with its concomitant intent requirement) *or* by "willfully misrepresenting a material fact." INA § 212(a)(6)(C)(i); 8 U.S.C. § 1182(a)(6)(C)(i). "The element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary." *Witter v. I.N.S.,* 113 F.3d 549, 554 (5th Cir.1997). The INS does not need to show intent to deceive; rather, knowledge of the falsity of the representation will suffice. *See [i]d.*; *Forbes v. INS*, 48 F.3d 439, 442 (9th Cir.1995); *Espinoza-Espinoza v. INS*, 554 F.2d 921, 925 (9th Cir.1977).

187 F.3d at 330 (emphasis in original). As the dissent concedes, this is also the current position of the BIA, and indeed, has been since it decided *Matter of Kai Hing Hui* more than thirty years ago. *See* 15 I & N Dec. at 290 ("We interpret the Attorney General's decision in *Matter of S- and B-C-* [9 I & N Dec. 436 (AG 1961)] as one which modified *Matter of G–G–* [7 I & N Dec. 161,164 (BIA 1956)] so that the intent to deceive is no longer required before the wilful [sic] misrepresentation charge comes into play.").[4]

---

[4] Parlak argues that treating "willful misrepresentation of a material fact" as a separate criterion for removal gives the fraud prong of § 1182(a)(6)(C)(i) no operative effect because there is never a need to prove an intent to deceive. But Parlak's reading itself renders "willful misrepresentation of a material fact" inoperative because he interprets it as identical to "fraud." We cannot say that a disjunctive reading of § 1182(a)(6)(C)(i) – the BIA's interpretation – is unreasonable given (1) that we generally "avoid an interpretation which would render words superfluous or redundant," *see Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001), (2) the use of the word "or," (3) that only a willful misrepresentation must additionally concern a "material fact," and (4) that Parlak advances no authority suggesting the phrase "fraud or willfully misrepresenting a material fact" should be read conjunctively. The dissent argues that we should look to the common law meanings of the words. However, with the statutory language as well as the relevant case law weighing heavily in favor of the BIA's interpretation, we find the agency's interpretation reasonable and see no reason not to afford it deference. *See Patel*, 432 F.3d at 692.

*Singh* does not suggest a contrary interpretation of "willful misrepresentation of a material fact." Instead, in *Singh*, this court addressed whether the BIA reasonably interpreted § 1182(a)(6)(C)(i) to "impute the *fraudulent* conduct of [an alien's] parents to [the alien child]." 451 F.3d at 403 (emphasis added). This court confirmed that the BIA has interpreted *fraud* pursuant to § 1182(a)(6)(C)(i) to require an intent to deceive. *See Singh*, 451 F.3d at 406-07 (emphasis added) (citing *Matter of G-G-*, 7 I & N Dec. at 164). Given this interpretation, the BIA's determination that fraudulent conduct could be imputed to a child was unreasonable because the child would lack the requisite intent to deceive. *Id.* at 405-409 (finding the BIA's interpretation unreasonable under the second step of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). Because *Singh* dealt only with fraud, contrary to Parlak's suggestion, it did not create a new "intent to deceive" requirement for willful misrepresentations.

In the case at hand, because the IJ and BIA determined that Parlak had willfully misrepresented a material fact, a finding of an intent to deceive was unnecessary. After citing a number of cases indicating that a "willful misrepresentation" must be "deliberate and voluntary," but need not include an intent to deceive, the IJ specifically found that Parlak "made willful misrepresentations on his I-485 Application." The BIA affirmed these "findings as to . . . removability. . .[of] an alien who has made a willful misrepresentation of a material fact." Thus, in determining that Parlak was removable pursuant to § 1182(a)(6)(C)(i) for willfully misrepresenting a material fact, the BIA was not required to find that Parlak had an intent to deceive.

## C.

Substantial evidence also supports the BIA's application of the proper legal standard to the facts here. Willful misrepresentations must be: (1) deliberate and voluntary, which requires only "knowledge of the falsity," *Forbes,* 48 F.3d at 442; and (2) material, meaning the misrepresentations must "have a natural tendency to influence the decisions of the [INS]," *id.* (quoting *Kungys v. United States*, 485 U.S. 759, 772 (1988)). Omissions of material facts can be material misrepresentations. *Matter of B-*, 7 I & N Dec. 465 (BIA 1957).

Parlak twice represented that he had no prior arrests or convictions; thus, he failed to disclose his arrest in Turkey in 1988 and his subsequent conviction. The BIA found that the questions on the application forms were unambiguous. Accordingly, Parlak's "no" answer provided the BIA with some evidence that Parlak's falsity was deliberate and voluntary. The BIA also relied upon the IJ's findings about the documentation Parlak submitted in connection with his asylum application. While Parlak did mention his arrest and sentence in the asylum application, he also submitted a falsely translated newspaper article. The translated version of the newspaper article offered by Parlak only stated that he was accused of being a PKK member and faced death by hanging; the true translation indicated that Parlak was on trial for killing two Turkish soldiers. Moreover, Parlak reported a death sentence in his asylum application but failed to mention that the sentence had been reduced and that an appeal from the prosecution was proceeding. The misrepresentations in the asylum application further support the conclusion that Parlak's subsequent falsity was also deliberate and voluntary.

These misrepresentations were also material. As the BIA explained:

> [T]he respondent's initial failure to mention the soldiers' deaths in the asylum application and his negative response to the question of whether he had ever been arrested in the other applications shut off a relevant line of inquiry into the respondent's role in the deaths of the two Turkish soldiers and, more broadly, the extent of his role in any armed resistance to the Turkish government. In each circumstance, the respondent's admissibility under 212(a)(3)(B) of the Act was at issue. In fact, the discovery of the full factual basis for the respondent's arrest ultimately caused the DHS to conclude that the respondent no longer remained a "refugee" under the Act.

Because these misrepresentations clearly had "a natural tendency to influence the decisions" of the DHS, *see Forbes*, 48 F.3d at 442, the BIA correctly concluded that the misrepresentations were material.

Overall, substantial evidence supports the BIA's determination that Parlak was removable pursuant to § 1182(a)(6)(C)(i) because he made willful misrepresentations of material fact.

We note that the BIA's discussion of material misrepresentation was limited to the failure to disclose the 1988 arrest and subsequent conviction. The IJ discussed other misrepresentations, including Parlak's nondisclosure of his affiliation with the ERNK, ARGK, or PPK and his denial of participation in terrorist activity. Because we review the BIA decision and because the evidence is sufficient to support its conclusion that Parlak was removable for willful misrepresentation about the 1998 arrest pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), we need not discuss any other asserted misrepresentations. In addition, because we have found Parlak inadmissible based on his misrepresentations about his 1998 arrest, we need not address the parties' lengthy arguments about whether he was also removable for terrorist activity.

IV.

The BIA found that Parlak was ineligible for withholding of removal because he assisted with PKK fundraising and transported weapons into Turkey for use by the PKK, thus assisting in the persecution of others. An individual who assists in the persecution of others is ineligible for withholding of removal. 8 U.S.C. § 1231(b)(3). Parlak challenges both the factual findings supporting this conclusion and the legal analysis underlying the conclusion that he assisted in persecution.

In discussing this issue, the BIA noted the IJ's finding that Parlak lacked credibility. At an earlier point in its opinion, the BIA had discussed the IJ's credibility determination, observing that the two most significant inconsistencies underlying it were the submission of the false translation in his asylum application and the denials of his 1988 arrest in his adjustment and naturalization applications. Also, earlier in its opinion, the BIA had discussed Parlak's objections to the IJ's reliance on Turkish conviction documents. While the Turkish conviction documents are far less central to the issues in the case than Parlak's brief suggests,[5] some discussion of them is necessary in order to place the factual findings on the persecution issue in context.

---

[5]The Turkish conviction documents have no impact on the misrepresentation issue already discussed.

At the hearing before the IJ, the government relied on certain documents arising out of the Turkish criminal proceedings against Parlak. Although the documents in part include factual information about the procedural history of the case, they also contain statements purportedly made by Parlak. Parlak contends that these statements were induced by torture he suffered at the hands of Turkish authorities. The IJ made no findings with respect to whether Parlak was tortured but did refer to the court documents, primarily to support its findings as to the procedural history of the case.[6]

The BIA noted the IJ's lack of findings as to torture and also noted Parlak's concession that the documents were reliable evidence of Parlak's conviction for separatism in 1990 and his resentencing in 2004. It rejected the argument that the IJ's rulings were reversible as unduly reliant on Parlak's statements in the documents and concluded that the record included sufficient evidence to support most of the IJ's findings as to removability and eligibility for certain forms of relief without resort to the documents. The BIA stated that it considered the Turkish conviction documents to be reliable evidence of Parlak's conviction and resentencing – the aspects of the documents that Parlak conceded to be reliable – for purposes of adjudicating the appeal but gave no indication that it otherwise considered the documents.

On appeal, Parlak devotes much attention to the BIA's handling of the documents issue, making a number of complaints.[7] From our perspective, it does not seem problematic for the BIA to have considered Parlak's appeal without the contested portions of the statements. Essentially, the BIA ruled that it would give Parlak the benefit of the best outcome he could have hoped for before the IJ with respect to

---

[6]The IJ also relied on these statements to support her finding that Parlak engaged in a terrorist activity. Because we affirm Parlak's removal on other grounds, we do not need to address the reliance of the IJ on these documents for her other findings.

[7]For example, Parlak makes a creative effort to import American criminal procedure rules prohibiting use of compelled confessions and harmless error analysis into the immigration context. Given our handling of the documents issue, we see no need to comment further on these arguments. We do note, however, that, if we accepted Parlak's arguments, his testimony about the facts underlying his conviction would likely amount to waiver of his Fifth Amendment privilege and thus support admissibility of the documents for impeachment purposes, leaving to the trier of fact consideration of the circumstances of the statements in assessing them.

admission of the statements – their exclusion.[8] Even with the exclusion of the portions of the documents not conceded by Parlak, the BIA determined that there was still sufficient evidence to support the IJ's factual findings on the other issues that form the basis for affirmance.

The BIA determined that the record supported a finding that Parlak assisted in the persecution of others by providing funding for the PKK and transporting weapons into Turkey for use by the PKK. The record does contain such evidence, none of which is derived from the Turkish conviction documents.

The PKK targeted for violence Turks and Kurds who aligned themselves with the Turkish government rather than the PKK's aims of an independent Kurdish state. Before the IJ, both the government's expert and Parlak's expert testified that the ERNK raised money for the PKK. Parlak admitted in his testimony before the IJ that he raised funds for the ERNK and that he knew the ERNK provided money to the PKK. He also admitted knowledge of PKK attacks on village guards and that the PKK in general advocated "revolutionary terror."

Parlak also testified about the military nature of his training in the Lebanon camp. He admitted to the illegal entry into Turkey in 1988. He admitted both to bringing weapons into the country, including an AK-47 rifle, a pistol, and a grenade, and to burying arms, ammunition, and explosives. Additionally, he acknowledged leading Turkish authorities to the location of the hidden weapons. He disputes that these weapons were for use by the PKK and instead testified that they were for his own personal use.

Parlak strongly argues that the record does not support the BIA's determination that Parlak admitted that the buried weapons included rockets. Parlak's testimony about

---

[8]If the IJ had explicitly ruled on whether the statements were induced by torture, there are several possible rulings. She might have determined that the claims of torture were untrue and considered the statements. She might have found that Parlak was tortured, but that other evidence corroborated the statements and thus made them sufficiently reliable for consideration. Or she might have excluded the statements as unreliable because induced by torture. In any event, consistent with the BIA's conclusion, any reliance by the IJ on the statements is so peripheral to her conclusions that it seems extremely unlikely that a specific ruling on torture would have affected the result before the IJ. Absent an explicit finding from the IJ, we will proceed, as did the BIA, under the assumption that the statements are unreliable.

the rockets is in fact ambiguous. The government attorney primarily questioned him about rocket launchers, not rockets. At first Parlak appeared to concede that his group had buried rocket launchers, along with arms, ammunition, and explosives, but at a later point he denied that rocket launchers were among the buried items. The final reference to rockets in the transcript appeared to elicit from Parlak a concession about the presence of rockets (not rocket launchers), but Parlak strongly argues that the reference is a transcription error and that the word should be "weapons" not "rockets." He brought the error to the attention of the BIA, but the BIA did not address the issue in its opinion.

Supplementing Parlak's testimony about weapons is the testimony of the government expert, FBI Special Agent Robert Miranda. Miranda analyzed Parlak's testimony about training at the PKK camp in Lebanon, his chosen method of entry into Turkey, the weapons he carried, and the burying of weapons. He concluded that the facts suggested that Parlak was moving into the military arm of the PKK and that his activities fit the profile of a PKK fighter. At one point Miranda mentioned rockets in passing, but his conclusions plainly did not depend on whether Parlak buried rockets.

The BIA considered the testimony of Parlak and Miranda. It also noted that the IJ's finding that Parlak buried the weapons for later use by PKK members was not clearly erroneous in view of the implausibility of Parlak's testimony that all of his weapons were for personal use. Having done so, it affirmed the IJ's findings.

Substantial evidence, as outlined above, supports the BIA's factual determinations. Parlak's strongest argument relates to the BIA's determination that the buried weapons included rockets, but this finding is not without support, at least as to rocket launchers, given the ambiguity of Parlak's testimony. Although the BIA attached some significance to the inclusion of rockets, its ruling was not dependent on that fact alone. Notably, none of the evidence on which the BIA relied came from the Turkish conviction documents. Without considering Parlak's statements from the Turkish conviction documents, we affirm the BIA's factual findings.

Parlak also challenges the BIA's legal analysis, arguing that the BIA failed to distinguish between genuine assistance in persecution and inconsequential association with persecutors, as articulated in *Fedorenko v. United States*, 449 U.S. 490 (1981), in determining when an individual assists in persecution. The BIA simply articulated the test as whether an individual "furthers persecution in some way," citing a 1988 BIA decision.

In *Fedorenko*, the Supreme Court determined that a concentration camp guard who shot at escaping inmates based on orders had "assisted in the persecution of civilians." 449 U.S. at 512 n.34. In a footnote, the court provided:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Id.* As Parlak notes, courts have since looked to *Fedorenko* for guidance in determining what constitutes "assisting in persecution." *See, e.g.*, *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 933 (9th Cir. 2006) (translating prisoners' responses during torture interrogations qualified as "assistance in persecution" under *Fedorenko*); *Xie v. INS*, 434 F.3d 136, 144 (2d Cir. 2006) (transporting captive women to undergo forced abortions constituted "assistance in persecution" under *Fedorenko*); *Singh v. Gonzales*, 417 F.3d 736, 739, 741 (7th Cir. 2005) (distinguishing between "genuine assistance in persecution and inconsequential association with persecutors," and concluding that taking innocent individuals into custody to face police abuse constituted "assistance in persecution" under *Fedorenko*).

We first note that the Supreme Court recently held that we are not necessarily bound by *Fedorenko*'s analysis because the INA has a different structure and purpose than the statute applied in *Fedorenko*, the Displaced Persons Act of 1948 ("DPA").

*Negusie v. Holder*, 129 S. Ct. 1159, 1165 (2009). Specifically, the Supreme Court found that although *Fedorenko* prevents consideration of whether an alien's assistance in persecution was voluntary for purposes of the DPA persecution bar, voluntariness is not necessarily irrelevant in determining whether an alien has assisted in persecution for purposes of the INA persecution bar. *Id.* at 1167. The Supreme Court remanded the matter to be decided by the BIA in the first instance. *Id.* at 1168.

*Negusie*'s holding, however, does not prevent all analogizing between *Fedorenko* and INA cases. Parlak, unlike Negusie, has not claimed that his actions were involuntary. Given that *Negusie* analyzed *Fedorenko*'s application only in the context of allegedly involuntary actions, we find that *Fedorenko*'s analysis of what constitutes persecution remains instructive where voluntariness is not at issue. Mindful of the differences between the DPA and the INA, we agree with the only circuits to have addressed this issue since *Negusie* and look to *Fedorenko* for guidance in defining what constitutes "assisting in persecution." *See Nguyen v. Holder*, No. 05-73353, 2009 WL 1956238, at *1 n. 1 (9th Cir. June 23, 2009) ("*Negusie* does not affect our reliance on *Fedorenko* to understand what kind of conduct constitutes persecution or assistance in persecution."); *Weng v. Holder*, 562 F.3d 510, 514 n.1 (2d Cir. 2009) ("Despite the[] differences between the statues, we find instructive-but do not consider ourselves bound by-*Fedorenko*'s and its progeny's interpretations of the DPA's persecutor bar."). As with the facts before the Ninth Circuit, "[s]ince there is no question here that [Parlak] acted voluntarily, there is no reason to remand in light of *Negusie*, and the question of whether [Parlak] participated in persecution can be decided based on existing circuit precedent." *Nguyen*, 2009 WL 1956238, at *1 n.1.[9] Indeed, in *Diaz-Zanatta v. Holder*, issued one day after *Negusie*, we announced our inclination to continue to apply *Fedorenko*: "We do not expect the Court's decision [in *Negusie*] to affect [petitioner's] case in a material way . . . because []he has never argued that []he was compelled" to perform the acts in question. 558 F.3d 450, 460 n.5 (6th Cir. 2009).

---

[9]Not only is our approach consistent with every circuit court to have substantively addressed the issue, but it is also the approach urged by *both* Parlak and the government in letter briefs submitted to this court on this very question. (Pet. Letter Br. at 1) (arguing that *Negusie* "does not impact this appeal" and "is not inconsistent with application of *Fedorenko*") (Resp. Letter Br. at 1) (same).

First, we conclude that the BIA's analysis was consistent with *Fedorenko*. To be sure, the BIA's statement that "[a] person assists in persecution of others when he furthers the persecution in *some* way" was vague and unhelpful on its own. As *Fedorenko* line-drawing shows, the issue is not whether the person assists in *some* way; rather the analysis requires distinguishing between "genuine assistance in persecution and inconsequential association with persecutors." *Singh*, 417 F.3d at 739. But the BIA decision proceeded to compare Parlak's provision of weapons for PKK fighters with the coordination of arms shipments for the Provisional Irish Republican Army, which was found to qualify as "assisting in persecution" in *Matter of McMullen*, 19 I & N Dec. 90, 97 (BIA 1984) (citing *Fedorenko*, 449 U.S. 490). This type of analogizing is entirely consistent with *Fedorenko* and its progeny. *See Singh*, 417 F.3d at 739-40. Moreover, the facts do support a conclusion of general assistance in persecution.

In *Diaz-Zanatta*, we recently interpreted the *Fedorenko* analysis to include "two distinct requirements." 558 F.3d at 455. First, "there must have been some nexus between the alien's actions and the persecution of others." *Id*. "[S]econd, if such a nexus is shown, the alien must have acted with scienter." *Id*. Parlak urges us to remand in light of *Diaz-Zanatta*. However, Diaz-Zanatta's alleged persecution of others was more ambiguous than that before us and might not have been undertaken knowingly. In *Diaz-Zanatta*, the petitioner provided information to the Peruvian military as part of her job with the Peruvian military intelligence agency. *Id*. at 453. As soon as she became aware of the possible misuse of this information, she modified her actions, leaked information to the press about the persecution, and eventually fled to the United States. *Id*. at 453-54. By contrast, Parlak voluntarily and knowingly provided money, which he knew could be used by the PKK for anything, *see Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) ("[M]oney is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts."), and weapons, which directly supported the PKK's persecution of others. Parlak's level of assistance is an order of magnitude greater than the harshest assessment one could possibly make about Diaz-Zanatta, and we find that a nexus exists between

Parlak's actions and the persecution of others and that Parlak acted knowingly. *See Diaz-Zanatta*, 558 F.3d at 455.

Secondly, even if we were to find *Fedorenko*'s interpretation of "assisting in persecution," and consequently *Diaz-Zanatta*'s two-part test, inapplicable to Parlak, providing money and weapons to PKK fighters satisfies the plain meaning of the phrase. The Merriam-Webster Dictionary defines "assist" as "to give usually supplementary support or aid to." *See* Merriam-Webster's Online Dictionary, http://www.merriam-webster.com /dictionary/assist (last visited May 19, 2009). The same dictionary defines "persecution" as "the act or practice of persecuting especially those who differ in origin, religion, or social outlook." *Id.* Black's Law Dictionary similarly defines "persecution" as "[v]iolent, cruel, and oppressive treatment directed toward a person or group of persons because of their race, religion, sexual orientation, politics, or other beliefs." Black's Law Dictionary (8th ed. 2004). This case does not require that we trace the tricky contours of "assist" and "persecution" for all circumstances; we need only look to the plain meaning of the words to decide that smuggling weapons across an international border to aid the PKK in committing violent acts against Turks and Turkish-aligned Kurds constitutes assistance in persecution.

Because the BIA did not err in its legal analysis and because its determination that Parlak assisted in the persecution of others was supported by substantial evidence, we affirm its conclusion that Parlak was ineligible for withholding of removal.

V.

Finally, we conclude that the BIA did not err in rejecting Parlak's application for a deferral of removal under the Convention Against Torture pursuant to 8 C.F.R. § 1208.18. An applicant seeking relief under the CAT has the burden of proving that it is more likely than not that he will be tortured if removed to the proposed country. 8 C.F.R. § 208.16(c)(2); *Berri v. Gonzales*, 468 F.3d 390, 397-98 (6th Cir. 2006). Parlak claims that the BIA erred because in assessing whether Parlak met his burden, it did not explicitly discuss Parlak's evidence that he had previously been tortured by Turkish officials.

"In deciding whether torture is more likely than not to occur upon the applicant's return to the country, we 'consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant . . . .'" *Berri*, 468 F.3d at 397-98 (quoting *Ali v. Reno*, 237 F.3d 591, 596-97 (6th Cir. 2001)); *see also* 8 C.F.R. § 208.16(c)(3)(i) (including "past torture inflicted upon the applicant" among "evidence relevant to the possibility of future torture [which] shall be considered"). While the BIA is required to *consider* "evidence" of past torture, neither *Berri* nor 8 C.F.R. § 208.16(c)(3)(i) require the BIA to make an explicit factual *finding* as to whether an applicant has previously been tortured. In addition, the BIA is also required to consider "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3)(iv).

Here, the BIA acknowledged that "there is some evidence that the respondent may face a possibility of mistreatment in Turkey." Because this evidence almost certainly included Parlak's assertions of past torture, the BIA's acknowledgment suggests that it properly "considered" the evidence of past torture. However, as required by 8 C.F.R. § 208.16(c)(3)(iv), the BIA also looked to other relevant evidence, including (1) the absence of evidence that Parlak is currently sought for any reason by the Turkish government and (2) reports that Turkey has taken significant steps toward eliminating torture. Weighing all the evidence, the BIA concluded that should Parlak return to Turkey, he would not be "more likely than not" to encounter torture. We conclude that the BIA considered the appropriate evidence, and substantial evidence supports its determination that Parlak did not meet his burden under the CAT.

## VI.

In summary, we deny Parlak's petition for review, concluding that the BIA correctly determined that he was removable for making willful misrepresentations in his adjustment and naturalization applications, that he was ineligible for withholding of removal because he assisted in the persecution of others, and that he has not met his burden for obtaining relief under the CAT. We need not reach the issues of whether Parlak was removable on other bases.

———————

**DISSENT**

———————

BOYCE F. MARTIN, JR., dissenting. This country offers its immigrants the chance for a new beginning, but retains the right to revoke the freedom it offers should it discover a past it dislikes, no matter how remote or ancient the offenses. I have no quarrel with that: for the nation's immigrants, past may always be prologue. I dissent, however, because this awesome power was used here to railroad a man out of our country.

The majority evidently approves of this mistreatment, and, in so doing, commits three significant errors. First, the standard used to conclude that Parlak made a "willful misrepresentation" was incorrect. Second, the majority effectively ignores recent Supreme Court and Circuit precedent when it finds that Parlak is ineligible for withholding of his removal. Third, the immigration judge improperly relied on evidence likely induced through torture by Turkish Security Courts, and the Board and now the majority both claim the supernatural ability to block from the mind's eye this evidence, which the IJ cited roughly eighty times. This record is replete with error, and unless fixed, we will simply never know if Parlak's deportation is just. I would therefore remand this case to a different immigration judge for a fair adjudication—justice demands no less.

I.

Ibrahim Parlak, a Turkish native, was convicted of Kurdish separatism by the now defunct Turkish "Security Courts." His conviction stemmed from a 1988 incident in Turkey involving a gun fight between Kurdish separatists and Turkish soldiers where two Turkish soldiers were killed. Parlak was arrested. While there, officials tortured him to obtain admissions of involvement with the Kurdistan Workers Party, known as the PKK, along with admissions of specific terrorist acts. He stated that the Turkish *gendarma* shocked him with electrodes, beat his genitalia, hung him by the arms, blindfolded him while depriving him of sleep, food, water and clothing, and anally raped

him with a truncheon. J.A. 874; 981-82. According to Parlak, after he refused to comply fully (despite this torture), the authorities brought in his seventy-year old father. J.A. 661-62.

After being interned for seventeen months, Parlak was released, though it is unclear whether that was because of a bribe or his cooperation. He left Turkey in 1991 and came to the U.S. where he was granted asylum based on his "well-founded fear of persecution." In his asylum application, he admitted supporting the PKK and he disclosed his 1988 arrest in Turkey. He adjusted his status in 1994 to lawful permanent resident, and, since 1994, has resided in Harbert, Michigan, where he owns a restaurant and is where his daughter was born. In 1998 he applied for naturalization, which the government denied on November 28, 2001.

The government says that it denied his application because he did not disclose his 1988 Turkish arrest, though it admits that the arrest was the entire basis of his earlier asylum application and thus the reason he had been allowed to live in the U.S. This "fraud" charge became the basis for his removal proceedings, but it was soon joined with others, including accusations of his having aided terrorist organizations and having been convicted of murdering Turkish soldiers "after admission" to the U.S.[1] Pending the result of his deportation proceedings, immigration services threw Parlak in jail, where he remained until a district court ordered his release because he was neither a flight-risk nor a threat to his community.

At his removal hearing, the immigration judge, Elizabeth Hacker, ruled against Parlak on every point. She was apparently so convinced of his guilt that her opinion consisted largely of a cut-and-pasted agglomeration of the government's *pre-trial* briefs. Her opinion relied heavily on evidence obtained via torture by the Turkish Security Courts; she cited those documents roughly eighty times. On review, the Board of Immigration Appeals professed to affirm all of the IJ's factual findings and credibility determinations without regard to the Security Court documents, though it did not explain

---

[1]The Turkish Security Courts that convicted him are were shut down due to their deserved infamy as havens of torture and injustice. *See* J.A. 974.

in detail how the IJ's conclusions could be supported without that evidence. The Board vacated the IJ's entirely meritless conclusion that Parlak murdered two Turkish soldiers, based wholly upon these same Turkish Security Court documents. But the Board repeated the IJ's other legal errors, many of which the majority repeats today.

## II

## A.

Assuming *arguendo* (and *dubitante*) that Parlak is removable, the majority nevertheless blunders by approving of an incorrect legal standard for finding an immigrant ineligible for withholding of removal. Its decision effectively guts controlling precedent of the Supreme Court, every other court of appeals to have addressed the issue, and this Court.

Some removable immigrants may avoid deportation because they qualify for "withholding." An immigrant is ineligible for withholding by the "persecutor bar," however, if he "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(B), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i). The Board did not apply this standard, however. Rather, it invented its own, and held that an immigrant is ineligible for withholding of removal whenever he "furthers persecution in some way."

This inadequate and overbroad statement lacks the well-defined and well-settled requirements that courts have delineated as necessary to satisfy the persecutor bar. Specifically, this Court requires the government to show: first, a "nexus between the alien's actions and the persecution of others such that the alien can fairly be characterized as having actually assisted or otherwise participated in such persecution," and second, "if such a nexus is shown, the alien must have acted with scienter; the alien must have had some level of prior or contemporaneous knowledge that persecution was being conducted." *Diaz-Zanatta v. Holder*, 558 F.3d 450, 455 (6th Cir. 2009) (citing *Singh v. Gonzalez*, 417 F.3d 736, 739 (7th Cir. 2005), and *Castaneda-Castillo v.*

*Gonzalez*, 488 F.3d 17, 20 (1st Cir. 2007)); *see also Balachova v. Mukasey*, 547 F.3d 374, 384 (2d Cir. 2008). Moreover, we explained in *Diaz-Zanatta* that, to find an alien ineligible for a withholding, the government must prove that "the alien . . . had some level of prior or contemporaneous knowledge that the persecution was being conducted." 558 F.3d at 455 ("In the present case, the IJ's opinion did not *consider* . . . whether Diaz-Zanatta had prior or contemporaneous knowledge of any such persecutions.") (emphasis added).

Instead of applying this precedent, the majority, though conceding (as it must) that the Board's "furthers persecution in some way standard" was utterly "vague and unhelpful," Maj. Op. at 15, inexplicably affirms anyway. That is wrong. Among its notable infirmities, this obviously inadequate "furthers the persecution in some way" standard in no way captures the "knowledge" requirement. So the proper result here would be to remand this case so the proper standard could be applied.

Indeed, the Supreme Court, by way of analogy, has repeatedly reinforced the need to remand cases like this one rather than engage in post hoc rationalizations of the Board's legal errors. In *Negusie v. Holder*, 129 S. Ct. 1159 (2009), for example, the Court ruled that the Board erred by refusing to consider the possibility that the Immigration and Nationality Act's persecutor bar *might* contain a "voluntariness" requirement—i.e. a "duress" exception. The Court ruled that the Board incorrectly assumed that *Federenko v. United States*, 449 U.S. 490 (1981), which construed the Displaced Persons Act of 1948, also completely controlled whether the Immigration and National Act contained a duress exception; the Board had determined that *Federenko* made clear that no such requirement existed and so there was no need to analyze the statute's text. Not so, said the Court: the Board's out-of-hand rejection of the "voluntariness" requirement was based on a "mistaken assumption stem[ing] from a failure to recognize the inapplicability of the principle of statutory construction invoked in *Fedorenko*, as well as a failure to appreciate the differences in statutory purpose." *Negusie*, 129 S. Ct. at 1167. The Court remanded so that the proper inquiry could be conducted.

As did the *Negusie* Court, we too should remand Parlak's case so the Board may clarify a "vague and unhelpful," Maj. Op. at 15, and therefore inadequate, standard. The *Negusie* Court concluded that, because "the BIA ha[d] not yet exercised its *Chevron* discretion to interpret the statute in question, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Negusie*, 129 S. Ct. at 1167 (quotation marks omitted) (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam), and *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam)). Yet today's majority sweeps aside the Board and IJ's error, and thus it also sweeps away the Supreme Court's *diktat* that a remand for such clarification is unnecessary only in "rare circumstances." *Negusie*, 129 S. Ct. at 1167 (quoting *Ventura*, 537 U.S. at 16-17). Parlak's case is not so rare, and while I agree that *Federenko*'s line-drawing footnote is instructive, *Federenko*, 449 U.S. at 512 n.34, it must be instructive for the Board in the first instance.

## B.

Moreover, *Diaz-Zanatta* made clear that the persecutor bar's knowledge requirement cannot be satisfied by a general finding that Parlak might have been aware that the PKK had, at some point, engaged in terrorist activity. Indeed we held it insufficient "that Diaz-Zanatta knew that persecutions were taking place, if information Diaz-Zanatta collected and relayed to the military was not used in those persecutions." *Diaz-Zanatta*, 558 F.3d at 460. Similarly, the Seventh Circuit, in *Doe v. Gonzales*, 484 F.3d 445 (7th Cir. 2007), held that an alien had not "assisted" or "participated" in execution style murders of Jesuits in El Salvador despite having carried a rifle and donned camouflage while accompanying the thirty-to-forty other officers that murdered innocents. Doe fired no shots but, upon returning to the base, destroyed log books that would have identified the participating soldiers. Even on an unsympathetic reading of the record Parlak was far less involved than Doe: he did not donate money directly to the PKK, and there is no evidence that the weapons he supposedly carried into Turkey and buried there ever made it into the PKK's hands or were used by anyone. Thus the

persecutor bar should not apply to Parlak, just as it did not apply to Doe or Diaz-Zanatta.[2]

The majority's only counter-argument is its assertion that "Parlak voluntarily and knowingly provided money, which he knew could be used by the PKK for anything," which is supported with no more than an out-of-context quote from *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000), a case about a first amendment challenge to a ban on giving aid to organizations involved in terrorist activity. This view that money is different in all respects is overbroad. Specifically, Parlak did not "provide[] money" to the PKK; he helped organize musical festivals for Kurds in Germany. These featured line-dancing, folk songs, and a shared sense of community for displaced Kurds unwelcome in Turkey. Although Parlak testified that, if profits remained after paying for the musicians and other entertainment, the remaining money was sent to the ERNK—Parlak had no other involvement. And while it is true that money is fungible, to satisfy the persecutor bar's scienter or knowledge requirement Parlak would have had to not only know that he was giving money to the PKK itself (not proven in the record), but further that either the money he gave directly led to persecution or freed up other funds to be used for persecution—he still had to intend to assist in persecution. That money is fungible cannot absolve the government of its need to prove an intent to assist in persecution.[3] Furthermore, the record here comes nowhere near proving the

---

[2]Incidentally, Parlak's dubious Security Court conviction for murder, which the IJ inexplicably treated with deference more appropriate for a legitimate domestic court judgment, was based on the Security Court's finding *not* that Parlak personally engaged in wrongdoing, but instead merely on his association with others who supposedly killed two Turkish soldiers. J.A. 1016 ("That although no evidence was found indicating that Defendants/Respondents Ibrahim PARLAK and Bektas YUKSELEN fired upon the military police during an armed confrontation that took place on 05/21/1988 while crossing into Turkey from Syria . . . the presence of these Defendants/Respondents as armed militants of the outlawed PKK organization at the scene of the event gives strength to the argument of subjects being actual offenders in the crime and thus according to their acts, according to section 125 of the TCK, they shall be PUNISHED BY THE DEATH PENALTY."); *Cf. Doe*, 484 F.3d at 451.

[3]The majority's quote from *Humanitarian Law Project*—"[M]oney is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts," 205 F.3d at 1136—while true, is irrelevant because it does not address scienter. Again, that is no surprise because *Humanitarian Law Project* was about a first amendment challenge to a blanket ban on providing aid to any group involved with terrorist activity; Congress had made a finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; AEDPA § 301(a)(7), 110 Stat. at 1247. That does not approach the persecutor bar's requirement that the government prove particularized facts regarding knowledge of or an intent to assist in persecution; and it is a far cry from requiring a causal connection with "actual persecution" and

particularized causal connection mandated by *Diaz-Zanatta*'s "link" or "nexus" requirement. Here, as with that case, there was no proven "actual connection between [petitioner's] actions and the persecution(s) in which [he] is alleged to have assisted or otherwise participated." 558 F.3d at 439 (citing *Singh*, 417 F.3d 740). And, as with that case, there was no evidence that any of the acts that supposedly assisted persecution—here, the Kurdish festivals—were "actually used [by the PKK] to persecute some individual or individuals." *Id.* at 460. Of course both the IJ and Board labored under the wrong standard; the majority strains to avoid a simple remand where the right questions could be asked and the answers could be properly ascertained.

Further, to buttress its de novo application of a standard that neither the IJ nor Board considered, the majority performs its own I-know-persecution-when-I-see-it review. Indeed, the majority does not really approve of the (universally accepted) legal hurdles *Diaz-Zanatta* requires, as it rather incredibly remarks that this standard could very well be "inapplicable to Parlak," which is nonsense because the case propounds the standard for *all persecutor bar cases*. This leads into its conclusory statement that "the plain meaning" of the persecutor bar means that "smuggling weapons across an international border to aid the PKK in committing violent acts against Turks and Turkish-aligned Kurds constitutes assistance in persecution." Let's unravel this. First, the evidentiary conclusion that Parlak "smuggled" weapons across the border is dubious—the idea that a handful of men carried a complete cache of weapons over mountains over the course of fourteen days is not supported by the evidence. In any event, there is no evidence in the record that Parlak did anything "to aid the PKK in committing violent acts." Apart from the Security Court documents, it will be recalled that the most Parlak admitted to was that at one time he was part of the ERNK, a group which he admits had ties to the PKK, and that some of his fundraising efforts "might" have found their way to PKK coffers. Even assuming this was somehow sufficient, there was never a finding that the weapons he supposedly smuggled and buried—the actual basis for his supposed persecution of others—made it to the PKK and were used in

_____

knowledge or intent of such persecution, as the persecutor bar does.

"violent acts against Turks or Turkish-aligned Kurds," nor was there a showing that he had knowledge that they would be used in such a way. *See Diaz-Zanatta*, 558 F.3d at 460 ("It is not enough that information collected by Diaz-Zanatta and relayed by her to the SIE was used to persecute individuals if Diaz-Zanatta had no prior or contemporaneous knowledge of that; neither is it enough that Diaz-Zanatta knew that persecutions were taking place, if information Diaz-Zanatta collected and relayed to the military *was not used* in those persecutions.") (emphasis added).

Thus, without additional factfinding, the record is insufficient to sustain the majority's unique and self-directed analysis which manages the Janus-esque feat of applying a standard for the first time on appeal—and improperly so—while simultaneously casting doubt upon that same standard's continued validity. Accordingly, at a minimum, a remand is necessary.

## III.

Apart from the majority's misapplication of the persecutor bar in contravention of established precedent, the factual basis underlying the IJ's and Board's conclusions was compiled by an immigration judge who repeatedly cited evidence induced by torture. Of course, the IJ made no finding about whether the evidence was the result of torture or not, a sin which the Board and majority treat as a virtue. Yet when has it ever been proper to *assume*, in the face of strong evidence and testimony to the contrary, that such evidence is untainted? To its credit, even the Board knew it could not (at least publicly) rely on such evidence.

Then again, perhaps the IJ cannot be faulted for such heavy reliance: Most of her references to the torture evidence were apparently cut-and-pasted from the government's pre-trial briefs, so maybe she simply had not read the underlying documents. *See Ayi v. Gonzales*, 460 F.3d 876, 884 (7th Cir. 2006) ("Troubling to us is the surprising lack of regard for the rich record in this case coupled with the fact that at least parts of the IJ's opinion appear to be a 'cut and paste' job from previous opinions."). The IJ's opinion

included the same errors as the government's briefs,[4] and this plagiarism makes the IJ's remark that she had presided over a "long and difficult hearing" ring hollow: what went on during the hearing was apparently of little relevance to her ultimate ruling.[5]

Of course, when the Board writes its own opinion, this Court reviews that decision directly. But the Board's attempt to uphold the IJ's various conclusions without regard to the tainted evidence she used to reach them cannot stand. Immigration judges are responsible for compiling the record in immigration cases, and the Board's evidentiary reconstruction is beyond what courts can or should do. Accordingly, a remand is necessary to fix the record.

In rejecting Parlak's contention that the record supporting his deportation is tainted, the majority demeans his supposedly "creative effort to import American criminal procedure rules prohibiting use of compelled confessions and harmless error analysis into the immigration context." Maj. Op. at 10 n.7. The pot calls the kettle black. Though professing not to reach the question, the majority, citing no case, statute, or treaty, "creatively" muses on the theoretical significance of torture-induced evidence. One footnote asserts that if torture-induced evidence was admitted then Parlak nevertheless waived the right to exclude it, *id.*, and another provides a list of guesses on the proper course of what a domestic court could do with torture evidence, *id.* at 11 n.8.

---

[4] The most egregious example of this was the IJ's complete copying of the terrorism section of the government's pre-trial briefs. Anyone who has ever graded a paper can tell you that the repetition of errors is the surest sign of plagiarism: here, the IJ's opinion improperly cites the 2004 Security Court document (properly cited as Exhibit A), as "Trial Exhibit 2, Tab A," which was actually Parlak's asylum application. In each instance, the IJ's error duplicates the same error by the government. *Compare, e.g.*, IJ at 51, J.A. 75, "Propaganda" *with* Gov't Pre-Trial Br. at 27, J.A. 1076.

[5] Further, it is not clear why the immigration judge thought the documents from the Turkish Security Court deserved deference or were at all reliable. *See, e.g.*, *Doe v*, 484 F.3d at 451 ("[I]t is not true in a case in which the proceeding that resulted in the conviction was demonstrably, and it is fair to say admittedly, a travesty—a parody—of justice."). The European Union forced Turkey to close these courts if it desired to join the union because of their history of torture and injustice. These documents were part of these courts' final, midnight actions, on the eve of their extinction. They were produced *in abstentia*, a solid sixteen years after the events in question. *See* U.S. DEPARTMENT OF STATE, 2004 COUNTRY REPORT ON HUMAN RIGHTS PRACTICES IN TURKEY, *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41713.htm ("Legislative amendments abolished the State Security Courts . . . . [S]ecurity forces applied torture and ill-treatment widely . . . . The Constitution prohibits such practices; however, members of the security forces continued to torture, beat, and otherwise abuse persons regularly, particularly in the southeast. Security forces most commonly tortured leftists and Kurdish rights activists."). Why give deference or weight to *that*?

Although this Court has held that the U.N. Convention Against Torture is not self-executing, *Renkel v. United States*, 456 F.3d 640, 645 (6th Cir. 2006); *see also Medellin v. Texas*, 128 S. Ct. 1346, 1367 (2008), the United States is nevertheless a signatory and the treaty states that torture induced evidence "shall not be invoked in any proceedings, except against a person accused of torture . . . ," 23 U.L.M. 1027, 1031 (1984). Further, "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings," *Reno v. Flores*, 507 U.S. 292, 306 (1993), and so due process and federal policy mandates that the government must shoulder the minimal burden of explaining *why* a court—federal, state, or immigration—ought to apply an exception to the general international rule of exclusion of torture-induced evidence. Instead, all we get is the majority's ill-considered dictum that somehow Parlak might be violating this Court's notion of fairness by requesting that he not be sent packing based on evidence obtained by torture.

## IV.

The above assumes that Parlak is removable because he made a "willful misrepresentation" to the government, but I do not agree with the standard the IJ and Board used to find that he had, and therefore think that the case should be remanded on this point as well. The majority believes Parlak is removable under 8 U.S.C. 1182(a)(6)(C)(i), which makes an alien removable "who, by fraud or willfully misrepresenting a material fact . . . sought to procure . . . a benefit under the [INA]."[6]

---

[6]There is some irony to Parlak now being removed for only this charge. As the district court in his habeas proceeding observed:

> [T]he Court observes what appears to be a piling on of removability charges against Petitioner. He was initially charged with removability essentially for false statements regarding his conviction in Turkey; neither charge subjected him to mandatory detention and ICE did not see fit to detain him. Then, he was charged with being an aggravated felon. [The IJ found that he was such a felon but the BIA vacated this ruling.] Even assuming a 1990 conviction [*in absentia*] may even be the predicate for being an aggravated felon, his bond review proceedings before the immigration judge focused on whether there is a reason to believe he is removable based on engaging in terrorist activity. At the time, Petitioner had not yet been charged as removable for being a terrorist. After the immigration judge's decision, Petitioner was formally charged as removable for engaging in terrorist activity. The manner in which Petitioner's case has proceeded, or rather escalated, raises suspicion as to the actions of ICE under the circumstances. Once Petitioner was labeled a terrorist, the proceedings took on a decidedly more complex, if not high-profile, aura.

The majority holds that while "fraud" would have required the government to prove that Parlak had a "specific intent to deceive," "willful misrepresentation," by contrast, would not, and requires only that the government prove by clear and convincing evidence that the allegedly false statement was "deliberate and voluntary." Maj. Op. at 7 (citing *Mwongera v. INS*, 187 F.3d 323, 330 (3rd Cir. 1999). This is incorrect.

Although Parlak primarily relies on *Singh v. Gonzales*, 451 F.3d 400 (6th Cir. 2006) to assert that both statutory terms require the government to prove an "intent to deceive," I agree with the majority that *Singh* does not control here. That case involved only "fraud" and did not discuss "willful misrepresentations." Yet, the majority, which outsources its reasoning to the Third Circuit's opinion in *Mwongera*, nevertheless creates an unwarranted distinction between these terms where none should be.

At first blush, the majority's simplistic reading is tempting: statutory terms should be interpreted so as not to render one of them superfluous, *see, e.g., United States v. Atlantic Research Corp.*, 551 U. S. 128, 137 (2007), and willful or intentional misrepresentation can, sort of, be interpreted as literally meaning only the "voluntary" and "deliberate" making of a false statement. But this view collapses under scrutiny.

First, the canon of interpreting statutory terms differently is no help here. Here, the satisfaction of either term leads to the same result (removability), and, under the majority's overbroad reading, "fraud" becomes a dead letter because it is reduced to a practical subset of "willful misrepresentation"—immigrants may be removed whenever a misrepresentation is voluntary and deliberate; there is no reason for the government to go further and prove "an intent to deceive."

Second, the majority's view is at odds with the common law meaning of these terms. They are undefined in the INA, and it is a "settled principle of statutory construction that, absent contrary indications, Congress intend[ed] to adopt the common law definition of statutory terms."*United States v. Shabani*, 513 U.S. 10, 13 (1994); *see*

---

*Parlak v. Baker*, 374 F. Supp. 2d 551, 561-62 (E.D. Mich. 2005). After all this, the government ends where it started.

*also United States v. Gagnon*, 553 F.3d 1021, 1027 (6th Cir. 2009). Traditionally, "willful" misrepresentations were not distinct from "fraudulent" ones. The categories of misrepresentation were limited to "negligent misrepresentation," "innocent misrepresentation," and "fraudulent misrepresentation," for which "willful misrepresentation" is but a synonym. *See* RESTATEMENT (SECOND) OF TORTS, § 525-52C (1977); RESTATEMENT (SECOND) OF CONTRACTS, § 159-73. "Fraudulent misrepresentation," or more generally, "fraud," derives from the general heading of "deceit." At common law, deceit required the same basic elements as does fraud today:

> It is said that a man is liable to an action for deceit if he makes a false representation to another, knowing it to be false, but *intending that the other should believe and act upon it*, if the person addressed believes it, and is thereby persuaded to act on his own harm.

OLIVER WENDELL HOLMES, JR., THE COMMON LAW, IV. FRAUD, MALICE, AND INTENT – THE THEORY OF TORTS (1881) (emphasis added).[7]

Consistent with this common law understanding, "willful misrepresentation" first appeared as a synonym for "fraudulent misrepresentation," which had come into use to distinguish fraud and deceit from "negligent" or "innocent" falsehoods. And, until today, this Court has always treated willful and fraudulent misrepresentation as one in the same, with both requiring a showing of "an intent to deceive." *See, e.g., Trice v. Comm'l Union Assurance Co. Ltd.*, 334 F.2d 673, 676 (6th Cir. 1964) ("To constitute false swearing and willful misrepresentation . . . it must appear undisputed that misstatements in the proof of loss were knowingly made with the intent to deceive or defraud the insurer."). In light of this common law history, had Congress wanted to create the subcategory that the majority recognizes today, it would have chosen some other term besides "willful misrepresentation."

---

[7] "The elements of deceit which throw the risk of his conduct upon a party are these. First, making a statement of facts purporting to be serious. Second, the known presence of another within hearing. *Third, known facts sufficient to warrant the expectation or suggest the probability that the other party will act on the statement* . . . . Fourth, the falsehood of the statement." *Id.* (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS, § 525.

So the better reading of the statute is that Congress used synonymous terms that encompass the same wrongdoing: fraud. Like the majority's, this reading suffers from the problem of reading two different terms alike. But it has the (rather essential) merit of comporting with the terms' traditional understanding and thus also Congressional intent. *See Shabani*, 513 U.S. at 13. It also reserves the drastic penalty of deportation for only fraudulent, intentional conduct.

This reading is no bolt out of the blue; it was the Board's long-standing view:

> Since the penalty is the same for actions accomplished by either fraud or willful misrepresentation, we believe the use of the word "fraud" and use of the term "willful misrepresentation" present two alternatives that are not substantially dissimilar. *Therefore, the phrase concerning willful misrepresentation should be read as requiring the misrepresentation to be of the same quality as does fraud.* This result can be readily reached if it is required that *the misrepresentation be made with knowledge of its falsity and with actual intent to deceive* so that an advantage under the immigration laws might be gained to which the alien would not have otherwise been entitled . . . .

> Our belief that fraud and misrepresentation—the actions prohibited—both relate to substantially similar acts finds reinforcement in the severity of the penalty visited upon one who violates . . . the act.

*Matter of G-G*, 7 I&N. Dec. 161, 164 (1956) (citations omitted and emphases added). It was this seminal interpretation that we recently cited in *Singh*.[8]

The IJ and Board thus erred in not requiring the government to prove by clear and convincing evidence that Parlak had an "intent to deceive" when it found he committed a "willful misrepresentation," and so we should remand so the proper standard may be applied. I need not wade into whether the Board's decision is supportable by substantial evidence (though the majority's strained efforts are

---

[8]If there is any difference between "fraud" and "willful misrepresentation," it is the one the Board relied on for decades: The Board's view has been that the two differ in that, with willful misrepresentation, the government need not prove that it or anyone else in fact relied on false statements made with the intent to deceive. *Matter of G-G*, I&N. Dec. at 164 ("In this way, the misrepresentation would be differentiated from an act committed in fraud only in that proof would not be necessary that the person to whom the misrepresentation was made was motivated to action because of the misrepresentation."). That distinction is irrelevant here, however, as the Board made a more fundamental error in not requiring the government to prove that Parlak had an "intent to deceive."

unpersuasive). But I note that it seems implausible that Parlak had the requisite "intent to deceive" considering he had already disclosed his Turkish arrest in his request for asylum (which had been granted largely on that ground), and he was represented by counsel at the time of his naturalization application.

V.

The IJ, the Board, and now the majority have committed significant legal errors in adjudicating Parlak's removal proceedings. As a result, he will be deported without a fair determination of his legal status — three flawed opinions do not equal one correct one. Thus, there is something unreal about the majority's attempt to characterize its decision as the most straightforward of applications of immigration law when the foregoing proceedings have been anything but ordinary. There is nothing ordinary about the majority's blanket approval of an admittedly "vague and unhelpful" legal standard. And there is nothing ordinary (or proper) about a proceeding infected from the start by extensive reliance on evidence likely induced by torture, particularly where the IJ could not be bothered to do more than copy and paste swaths of the government's briefs. Those errors cannot be wished away by imaginative reconstruction—immigrants deserve better. *See, e.g., Benslimane v. Gonzales*, 430 F.3d 828 (7th Cir. 2005) (Posner, J.); *Alexandrov v. Gonzales*, 442 F.3d 395, 404 (6th Cir. 2006); *N'Diom v. Gonzales*, 442 F.3d 494, 500 (6th Cir. 2006) (Martin, J., concurring).

The only saving grace for Parlak has been that, contra to the government's wishes, he did not have to sit in jail awaiting the result of these dodgy proceedings. *See Parlak*, 374 F. Supp. 2d at 561-62 (granting Parlak habeas corpus relief against indefinite detention). The district court's decision proved prescient, as, four years later, his case has been neither swift nor error-free, despite the government's assurances.

One can only hope that the majority is correct that conditions in Turkey have changed enough that a Kurd like Parlak, who will be ordered to leave his life in the United States behind him and to start anew, does not have to fear being beaten or slain

upon his return.**9** And what has all this sound and fury been about? It all remains hazy. I agree though with Judge Cohn's best-guess as to why a supposedly straightforward immigration case became such a cause célèbre within the halls of those entrusted with removing him:

> Stepping back, the Court is left with the impression that the vigor with which [the authorities] ha[ve] given this case, and particularly the manner in which it is pursing Petitioner's detention, stems from the introduction of the moniker "terrorist."

*Parlak*, 374 F. Supp. 2d at 562 n.11. The majority thinks itself modest, but there is nothing modest about approving the clandestine and questionable proceedings that led here. This case should be remanded to a new immigration judge so that a proper record could be compiled and the right standards applied to the relevant issues.

I remain hopeful, nevertheless, that this case is but a sad remnant of an era of paranoid, overzealous, error-riddled, and misguided anti-terrorism and immigration enforcement now gone by the wayside. It is just a shame that, even if my hope proves true, it is too late for Ibrahim Parlak.

I respectfully dissent.

---

**9**At the time of this opinion, bills are pending in both the House and the Senate that, if passed, would designate Ibrahim Parlak a lawful permanent resident of the United States. S. 403 111th Cong. (2009); H.R. 976, 111th Cong. (2009).