*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0083p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————————

LUISA MARGARITA DIAZ-ZANATTA,
                                         *Petitioner,*

          *v.*                                                    No. 08-3097

ERIC H. HOLDER, JR., Attorney General,
                                         *Respondent.*

On Appeal from the Board of Immigration Appeals.
No. A76 428 081.

Argued:  December 11, 2008

Decided and Filed:  March 4, 2009

Before:  KENNEDY, BATCHELDER, and DAUGHTREY, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Douglas S. Weigle, BARTLETT & WEIGLE, Cincinnati, Ohio, for Petitioner.
Michael C. Heyse, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Respondent. **ON BRIEF:** Barry L. Frager, FRAGER LAW FIRM, Memphis,
Tennessee, for Petitioner.  Michael C. Heyse, Mary Jane Candaux, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

—————————————

**OPINION**

—————————————

ALICE M. BATCHELDER, Circuit Judge.  Luisa Margarita Diaz-Zanatta seeks
review of the denial of her petition for asylum and withholding of removal.  An immigration
judge ("IJ") found that, because Diaz-Zanatta had "assisted or otherwise participated in the
persecution" of others, *see* 8 U.S.C. §§ 1158(B)(2)(a)(i) and 1231(b)(3)(B)(i), while she was
a member of Peruvian military intelligence, she was ineligible for these forms of relief.  The

1

IJ instead granted Diaz-Zanatta a deferral of removal under the Convention Against Torture.[1] The Board of Immigration Appeals ("BIA") affirmed and adopted the IJ's opinion. Diaz-Zanatta now petitions for review.

The government contends that the meaning of the statutory language "assisted, or otherwise participated in the persecution," as written in 8 U.S.C. §§ 1158 and 1231, is plain and unambiguous, and, in any event, is controlled by *Fedorenko v. United States*, 449 U.S. 490 (1981), a case involving these terms in a different statute and in the context of the denaturalization of an individual who had been a guard at a Nazi concentration camp. We disagree with the government's view, and conclude that the legal analysis of these terms when applied to an alien who is accused of having "assisted or participated in persecution" in the context of working for a legitimate arm of a recognized government differs materially from that analysis when applied to an alien who served as a Nazi concentration camp guard. Because we further conclude that in applying the persecution bar to Diaz-Zanatta, the IJ erred as a matter of law by failing to conduct the appropriate analysis and make the necessary findings of fact, we will remand the case for further proceedings.

## I. BACKGROUND

In 1993, Diaz-Zanatta graduated from military intelligence school and became an intelligence analyst with a division of the Peruvian military — the Servicio de Inteligencia del Ejercito ("SIE" or "army intelligence"). The SIE was charged with collecting intelligence about and apprehending terrorists, who were then supposed to be handed over to the Directorate Against Terrorism ("DIRCOTE") for placement in the judicial system. Diaz-Zanatta was required to gather information on individuals and pass that information up the chain of command. For example, one of Diaz-Zanatta's first assignments was to attend a meeting for an organization at the University of San Marcos

---

[1] The relief granted Diaz-Zanatta by the BIA — deferral of removal under the CAT — is "a less durable form of relief and is not as desirable as the other forms of relief that the immigration judge denied." *Singh v. Gonzales*, 417 F.3d 736, 738 n.1 (7th Cir. 2005) (quotation marks and citation omitted). "Specifically, deferral of removal has two significant limitations: (1) it does not confer a right to release for aliens in the government's custody, and (2) it may be terminated at any time." *Id.* (quotation marks, editorial marks, and citations omitted).

and report whether a particular professor had communist tendencies. Shortly after beginning her employment with the SIE, Diaz-Zanatta became aware of conduct by other factions of the Peruvian military that led her to believe that human rights violations were taking place at the hands of the military, and that the suspected terrorists were not being handed over to the judicial system for trial. The first such instance occurred in June 1993, when Diaz-Zanatta heard screams coming from the basement of the building in which she worked.

Diaz-Zanatta testified that she reported her concerns to her supervisor and requested an immediate transfer. In August 1993, she was reclassified to work at a broadcasting department of Peruvian intelligence. Over the ensuing years, Diaz-Zanatta was assigned a number of different jobs. The precise chronology and details of these jobs are not clear from the record, but it appears that from this point on, Diaz-Zanatta worked as an operative for the SIE. On one of her assignments, Diaz-Zanatta was placed at the Real Felipe Museum where she worked undercover as a secretary and provided information to the SIE. On another assignment, Diaz-Zanatta listened to and transcribed telephone conversations of designated individuals.

Diaz-Zanatta claimed that she was mistreated throughout her tenure at SIE. Early in her career, after she first expressed concern to her supervisor about the possibility that human rights violations were taking place, the supervisor began sexually harassing her. Throughout her career, she was sexually harassed by a number of different individuals in the Peruvian military. Diaz-Zanatta claimed that Major Ricardo Anderson, one of the supervisors who had sexually harassed her, came to her house, broke the windows, pointed his gun at her sister, and then beat Diaz-Zanatta until she lost consciousness. When she reported this to the police, the military threatened her and demanded that she retract her accusations.

In late 1996, Diaz-Zanatta had a discussion with an old friend, Mariela Barreto, who was also an SIE agent. Barreto told Diaz-Zanatta that she had been a member of a para-military group that was responsible for many deaths and disappearances around Peru, including the massacre of a number of professors and students at La Cantuta

University.  Because she had felt very guilty about her involvement in these atrocities, Barreto said, she had leaked information about them to the magazine "Si," and now she was suspected of leaking this information and feared for her life.  Less than a month later, Barreto was found dead, her body dismembered.  About a week after that, another of Diaz-Zanatta's colleagues who had spoken out about the abuses of the Peruvian military was found beaten and paralyzed.  Diaz-Zanatta characterized these incidents as creating a period of "hysteria" in the Peruvian intelligence community.  It was clear that the beating and killing of Diaz-Zanatta's colleagues was carried out by individuals linked to the Peruvian military and SIE.  In fact, Diaz-Zanatta's former supervisor Major Anderson, was among those the police arrested.

Diaz-Zanatta was deeply troubled by all of this.  In an effort to substantiate the claims of her former colleagues and to save the life of a journalist who had spoken out against human rights abuses, she began secretly to leak information to the press.  Not surprisingly, Diaz-Zanatta also began to fear for her own life.  On one occasion, government agents attempted to run over her with a vehicle, but instead struck and severely injured one of Diaz-Zanatta's female colleagues.  About a week later, a friend warned Diaz-Zanatta that her life was in jeopardy, and on December 16, 1997, Diaz-Zanatta left SIE and fled to the United States.

Since arriving in the United States, Diaz-Zanatta has spoken out repeatedly against the human rights violations that were carried out by the Peruvian government, making public declarations to numerous press outlets, including CNN, CBS, ECCO, *The Miami Herald*, *El Nuevo Herald*, London's BBC, and Italian televison.  For her efforts, she has received death threats while she has been living in the United States, and she fears that she would be tortured or killed if she were to return to Peru.

Diaz-Zanatta applied for asylum and withholding of removal.  The IJ denied Diaz-Zanatta's application on the grounds that she was ineligible for these forms of relief because, while working for SIE, she had:

> assisted or otherwise participated [in persecution] by writing the reports or by transcribing the verbatim conversations that she heard and by

> sending them up the chain of command. Not unlike the death camp guard in [*Fedorenko v. United States*, 449 U.S. 490 (1981)], who participated in the process even if he did not operate the gas chambers, respondent was an important part of operating this process.

Diaz-Zanatta argued that, at least initially, she did not know that such persecution was taking place, and that the persecution was being carried out by rogue paramilitary elements within Peruvian intelligence, not by the general Peruvian intelligence community itself. The IJ did not make any findings on these arguments, but instead, by equating *Federenko*'s holding that the statute at issue there contains no involuntary assistance exception to the persecution bar, 449 U.S. at 512, to a holding that there is no exception for lack of knowledge of the persecution, noted that "her knowledge was immaterial." The BIA affirmed and adopted the IJ's opinion.

## II. STANDARD OF REVIEW

Where the BIA summarily adopts the IJ's decision without issuing its own opinion, we review the decision of the IJ as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005). "[T]he factual findings of the IJ are reviewed under the substantial-evidence standard, and we will not reverse those findings 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). But "[a] determination based on flawed reasoning . . . will not satisfy the substantial evidence standard, and the agency's use of an inappropriately stringent standard when evaluating an applicant's testimony constitutes *legal*, not factual error." *Balachova v. Mukasey*, 547 F. 3d 374, 380 (2d Cir. 2008) (internal quotations and citations omitted). "[W]e generally review questions of law de novo, but 'defer to the [IJ]'s reasonable interpretations of the INA.'" *Singh*, 451 F.3d at 403 (quoting *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005)).

## III.  ANALYSIS

### A.  Legal Standards

Congress has prohibited the granting of asylum and withholding of removal to any alien who "ordered incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1158(b)(2)(A)(i) (applying to asylum); *accord* § 1231(b)(3)(B)(i) (virtually identical language applying to withholding of removal); *see also* § 1158(b)(1)(A) (making the designation of the alien as a "refugee" a condition for granting asylum); § 1101(a)(42) (defining "refugee" as not including anyone who participated in persecution, and using language identical to that in § 1158(b)(2)(A)(i)).

*Fedorenko* remains the standard for invoking this "persecution bar" — i.e., for deciding whether an alien's conduct amounts to assisting or participating in persecution. But, as the circuit courts have applied this statute to aliens who were not Nazi concentration camp guards, two distinct requirements have emerged.  First, the alien must have done more than simply associate with persecutors; there must have been some nexus between the alien's actions and the persecution of others, such that the alien can fairly be characterized as having actually assisted or otherwise participated in that persecution.  *See Singh v. Gonzales*, 417 F.3d 736 (7th Cir. 2005).  And second, if such a nexus is shown, the alien must have acted with scienter; the alien must have had some level of prior or contemporaneous knowledge that the persecution was being conducted. *See Castenada-Castillo v. Gonzales*, 488 F.3d 17 (1st Cir. 2007); *Singh*, 417 F.3d at 740. Heretofore this circuit has not spoken to the persecution bar in circumstances other than the alien's involvement in prison or concentration camps, and this case requires us to consider whether we should adopt the reasoning and the requirements set out in the cases decided in those other circuits.[2]

---

[2]The leading agency adjudication on this issue, *In re A-H-*, 23 I.&N. Dec. 774, 784 (Att'y Gen. 2005), is consistent with this approach, finding that a leader-in-exile could reasonably be considered to have assisted or participated in persecution because he "was aware of the atrocities committed," and encouraged or condoned them.

Furthermore, in this opinion, the Attorney General carved out an exception for civil war situations that appears to apply in this case.

We turn first to the nexus requirement as illustrated by the Seventh Circuit's case of *Singh v. Gonzales*, 417 F.3d 736 (7th Cir. 2005). Harpal Singh was a "head constable" in the Punjabi police force. Singh acknowledged that the Punjabi police force, on multiple occasions, "crossed the line" and persecuted innocent civilians, but he denied having any direct involvement with these activities.[3] The Seventh Circuit noted that the case law as it pertains to Nazi concentration camp guards is quite clear: membership in the ranks of Nazi concentration camp guards, regardless of any direct involvement in the atrocities carried out at the camp, is sufficient to constitute assistance in prohibited persecution. *Id*. at 739 (collecting cases). But the court distinguished Singh's case from that of a Nazi guard: "Unlike Nazi concentration camps, whose complete existence was premised upon the persecution of innocent civilians, local Punjabi police departments served traditional, legitimate law enforcement purposes and did not exclusively engage in the persecution of innocent Sikhs." *Id*. (internal citations omitted). Accordingly, "simply being a member of a local Punjabi police department during the pertinent period of persecution is not enough to trigger" application of the persecution bar. *Id*. at 739-40. "Rather, . . . the record must reveal that the alien *actually* assisted or otherwise participated in the persecution of another on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*.

---

> In the context of a civil war between a government and opposition groups, the BIA has determined that 'persecution' does not include 'harm which may result incidentally' from, or that is directly related to, the military objectives of the armed conflict, including 'the drafting of youths as soldiers, the unofficial recruiting of soldiers by force, the disciplining of members of a rebel group, or the prosecution of draft dodgers.'

*Id*. at 784 (quoting *In re Rodriguez-Majano*, 19 I.&N. Dec. 811, 815 (BIA 1988), and citing *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)). Consequently, in light of the fact that Peru is in a state of civil war in which its democratic government faces opposition from the Shining Path rebel group, we could conclude that Diaz-Zanatta's activities fall within this exception and, therefore, would not amount to persecution under the agency's prevailing case law.

[3]Singh admitted to some involvement:

> Yet, Singh does admit that he brought — supposedly unwittingly but certainly repeatedly — innocent Sikhs into the police station where they were wrongfully beaten by others. Singh similarly concedes that he went on nighttime raids that led to false charges against and beatings of innocent Sikh families. He asserts that his role in these raids was limited to standing guard outside homes to prevent occupants from escaping while other officers were unjustifiably arresting and beating the family members inside. Additionally, Singh states that while he was personally opposed to his police force's oppression of his fellow Sikhs, he elected to continue working for the police for financial reasons.

*Singh*, 417 F.3d at 736.

at 740 (emphasis in original).  And the court noted that *Fedorenko*, the seminal case on matters of persecution assistance, had acknowledged that persecution cases outside of the context of Nazi prison guards might present more difficult problems with regard to what actions would constitute assistance.  *Id.* at 739.

We read *Singh* to stand for the proposition that in order for the persecution bar to apply, there must be some actual connection between the actions of the alien and the persecution of others.  Singh's mere membership in the Punjabi police force would not suffice because it would have been entirely possible for him, as head constable, to engage only in the traditional, legitimate law enforcement activities of the police force. In that case, although other members of the Punjabi police force may have persecuted civilians, there would not necessarily have been any link between Singh's actions and any such persecution, and it would be impossible to characterize Singh as having actually "assisted or otherwise participated in the persecution of another."

Other circuits also require some actual connection between the actions of the alien and the persecution of the victims.  The Eleventh Circuit, in *Chen v. U.S. Attorney General*, 513 F.3d 1255 (11th Cir. 2008), after reviewing *Fedorenko* and the development of the law in this area, held:

> The standard for determining whether an asylum applicant is ineligible for asylum and withholding of removal due to assistance or participation in persecution is a particularized, fact-specific inquiry into whether the applicant's personal conduct was merely indirect, peripheral and inconsequential association or was active, direct and integral to the underlying persecution.

*Chen*, 513 F.3d at 1259.  The Second Circuit drew a similar distinction:

> Where the [alien's] conduct was active and had direct consequences for the victims, we concluded that it was 'assistance in persecution.'  Where the [alien's] conduct was tangential to the acts of oppression and passive in nature, however, we declined to hold that it amounted to such assistance.

*Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006).  "[T]he mere fact that [the alien] may be associated with an enterprise that engages in persecution is insufficient by itself to

trigger the effects of the persecutor bar." *Gao v. United States Attorney General*, 500 F.3d 93, 99 (2d Cir. 2007) (noting that *Fedorenko* itself, albeit in dicta, had disapproved of the "guilt by association" approach; and making it clear that something more than mere association with persecutors is required).

Ultimately, the Seventh Circuit applied the persecution bar to Singh because he had, at least indirectly, participated *knowingly* in the persecution of others.

> [Singh] took innocent Sikhs into custody during that period and transported them to the police station, where he knew they would be subjected to unjustified physical abuse. Further, Singh participated in raids on the homes of innocent Sikh families, guarding those homes to prevent escapes while other officers were inside arresting and beating family members without cause.

*Singh*, 417 F.3d at 740. Singh's role in these activities "qualifies as actual assistance or participation in persecution" the Seventh Circuit said, even though Singh claimed that he did not learn until after the fact that the Sikhs whose homes he was guarding were innocent. *Id.* (It is worth noting here that Singh did not claim that he did not learn until after the fact that these Sikhs were being beaten, only that he did not know they were innocent.) The court found a sufficient nexus between Singh's actions and the persecution of others to permit the persecution bar to be applied to him. Although the court did not expressly address any knowledge requirement, it is clear that the mere effect of Singh's actions was not sufficient; his knowledge of the physical abuse was essential.

The First Circuit explicitly established the knowledge — or scienter — requirement in *Castaneda-Castillo*, 488 F.3d at 22. Castaneda was a lieutenant in the Peruvian military who had led one of four patrol units in an operation that turned into a massacre of dozens of innocent villagers. *Id.* at 19. While two patrol units entered a village to conduct a search for Shining Path members, Castaneda's unit set up position some three to five miles outside the village, with instructions to block any suspects from escaping that way. *Id.* Castaneda's unit never entered the village and he testified that he was unaware of the massacre until almost three weeks later. *Id.*

Noting that no one denied that the massacres were in fact persecution, the First Circuit held that, although Castaneda's blocking of escape routes had the objective effect of aiding in the massacre of the villagers, the persecution bar should not apply unless Castaneda had some prior knowledge of an intent to murder the villagers or some contemporaneous knowledge that the murders were being committed. *Id*. at 20-22. Specifically, the court announced:

> We hold that *presumptively* the persecutor bar should be read not to apply to Castaneda *if* his version of his state of mind is accepted. On remand the agency can, if it wants, try to develop a construction more favorable to the government. But this would have to be done expressly and persuasively, and not by vague reference to the 'totality of conduct' that conflates the question whether one's conduct constitutes 'assistance' with the question whether one possessed such scienter as may be required under the circumstances.

*Id.* at 22 (editorial marks omitted). In other words, the IJ could not avoid the issue of whether the alien had the requisite knowledge merely by focusing on the objective effect of the alien's actions. The court emphasized that, on remand, the IJ could find that the alien's story was not credible, and that he had, in fact, known that the massacre was going to take place. The court also noted the possibility of "gray-area cases," such as those involving willful blindness, strong suspicion, or some other "in between" assessment, which might prove more difficult. *Id*. at 21.

The Second Circuit has also adopted the knowledge requirement. In *Gao*, the court held that "the persecutor bar requires some level of culpable knowledge that the consequences of one's actions would assist in acts of persecution." *Gao*, 500 F.3d at 103. And in *Balachova*, 547 F.3d at 385, the court held that "notwithstanding the fact that the persecutor bar does not include a voluntariness requirement, the alien must have sufficient knowledge that his or her actions may assist in persecution to make those actions culpable."

Finally, the asylum petitioner bears the burden of demonstrating that the persecution bar does not apply to her. In order to be eligible for asylum, the alien must be a refugee, 8 U.S.C. § 1158(b)(1)(A); the alien bears the burden of establishing that

she is a refugee, 8 U.S.C. § 1158(b)(1) (B)(i); but the provisions of § 1158(b)(1) "shall not apply to an alien if the Attorney General determines that (i) the alien . . . assisted, or otherwise participated in . . . persecution," 8 U.S.C. § 1158(b)(2)(A)(i).  For asylum applications filed after April 1, 1997, the denial of asylum is mandatory "if section [1158(a)(2) or 1158(b)(2)] of the Act applies to the applicant."  8 C.F.R. § 1208(13)(c). And "if the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."  8 C.F.R. § 1240.8(d). Similarly, the petitioner seeking withholding of removal bears the burden of proving that the persecution bar does not apply to her.  8 C.F.R. § 1208.16(d)(2).

## B.  Applying these Standards to Diaz-Zanatta

In the present case, the IJ's opinion did not consider whether any evidence in the record established a nexus between the intelligence gathered by Diaz-Zanatta and the persecution of individuals at the hands of the Peruvian military, or whether Diaz-Zanatta had prior or contemporaneous knowledge of any such persecutions.  We begin with the question of nexus.

The government could establish this nexus with evidence that Diaz-Zanatta provided intelligence about an individual who was subsequently persecuted.  But not on this record.  In this record, the government has shown:  (1) that Diaz-Zanatta collected intelligence information and provided that information to her supervisors in the SIE (which is a division of the Peruvian military), to be handed over to the DIRCOTE, for the purpose of prosecuting terrorists; and (2) that other elements of the Peruvian military have engaged in persecution.  More to the point, while some elements of the Peruvian military undoubtedly engaged in persecution, the government does not dispute that, overall, the Peruvian military engaged in legitimate activities as well.  Absent some evidence linking Diaz-Zanatta's information gathering to persecution, we cannot say that she "*actually* assisted or otherwise participated in the persecution of another," *Singh*, 417 F.3d at 740, or that her actions were anything more than "tangential to the acts of oppression and passive in nature," *Xie*, 434 F.3d at 143.

Instead of making any findings with respect to such a nexus, the IJ reasoned that Diaz-Zanatta had assisted or otherwise persecuted others by "transcribing the verbatim conversations that she heard and by sending them up the chain of command." The IJ concluded that, "[n]ot unlike the [Nazi] death camp guard in *Fedorenko*, who participated in the process even if he did not operate the gas chambers, [Diaz-Zanatta] was an important part of operating this process." But the IJ's rote reliance on *Fedorenko* here is misplaced for the same reasons that the Seventh Circuit found it inappropriate in *Singh*. The Peruvian military intelligence community and the Punjabi police force are in this respect similar: while some members engaged in some persecution, each engaged in traditional, legitimate activities as well. The kind of information Diaz-Zanatta was gathering was being gathered for legitimate (lawful) purposes to be used in courts in fighting the terrorists who were seeking to overthrow by force the democratic government of Peru. As the Seventh Circuit recognized, such organizations stand in stark contrast to Nazi concentration camps, "whose complete existence was premised upon the persecution of innocent civilians." *Id*. at 439. Because Diaz-Zanatta's mere employment in the Peruvian military intelligence community does not permit the conclusion that during that employment she assisted or otherwise participated in any persecution, it is not sufficient to justify applying the persecution bar to her. Rather, to justify the application of persecution bar to Diaz-Zanatta, the IJ must find that the record demonstrates some actual connection between Diaz-Zanatta's actions and the persecution(s) in which she is alleged to have assisted or otherwise participated. *See id.* at 440.

The IJ found "instructive," although not binding, the case of *Higuit v. Gonzalez*, 433 F.3d 417 (4th Cir. 2006), in which the Fourth Circuit found that the persecution bar applied to an alien who had been a military intelligence officer for the Marcos government in the Philippines. But *Higuit* must be distinguished here, because the alien, Luis Higuit, had stated, both in his asylum application and in his testimony, "that individuals he investigated were imprisoned and killed." *Id*. at 418. Accordingly, the government was able to show conclusively an actual connection between Higuit's

activities and the persecution of others, and the IJ was therefore correct in concluding that the alien's "intelligence activities led to the persecution" of many individuals. *Id.*

Unlike Higuit, Diaz-Zanatta did not testify that any individuals she investigated were persecuted, and the record does not contain evidence to support the assumption that they were. The government does not appear to have produced, and the IJ certainly did not point to, any evidence indicating that Diaz-Zanatta gathered any information about anyone known to be or later identified as a member of Shining Path or any other terrorist organization, or that after Diaz-Zanatta provided intelligence information about any particular individual, that individual was persecuted. Rather, the IJ simply accepted that it was enough that the evidence in the record established that the Peruvian military persecuted prisoners suspected of being Shining Path collaborators. But this not sufficient to establish any connection between Diaz-Zanatta's actions and the persecution of anyone; under this reasoning, if Diaz-Zanatta had collected intelligence solely on teachers in Peru, and no one but lumberjacks had been persecuted by the military, Diaz-Zanatta would nonetheless have assisted or participated in persecution.

Nor did the IJ examine whether Diaz-Zanatta had either prior or contemporaneous knowledge of the persecution being carried out by the military and that the information she gathered would be used in furtherance of it. Despite Diaz-Zanatta's uncontradicted testimony that she did *not* know how that information was being used, and that she was not aware of the persecution of any individual about whom she had gathered information, the IJ concluded that "[Diaz-Zanatta's] knowledge is immaterial." We are persuaded, however, that for the reasons described by the First Circuit in *Castaneda–Castillo*, 488 F.3d at 20-21, the persecution bar may be applied to Diaz-Zanatta only if she had some level of prior or contemporaneous knowledge that the information she was gathering would be or was being used to persecute individuals. Like the First Circuit, we can envision "gray-area cases," such as those involving willful blindness, strong suspicion, or some other "in between" assessment, *see id.* at 21, and we recognize that the persecution bar's scienter requirement may well be met in some of these instances. But we need not delve into that issue in this case because the IJ has

made *no* finding with respect to Diaz-Zanatta's level of prior or contemporaneous knowledge.

In concluding that Diaz-Zanatta's knowledge was "immaterial," the IJ appears to have equated unknowing assistance to involuntary assistance. The IJ cited *Fedorenko* for the proposition that "there is no basis for an involuntary assistance exception regarding persecution of others." Even assuming this is an accurate characterization of *Fedorenko*,[4] it has no applicability to Diaz-Zanatta because she never argued that she provided involuntary assistance.[5] Because unknowing assistance is entirely different from involuntary assistance, the IJ erred to the extent it relied on *Fedorenko* to disregard Diaz-Zanatta's scienter argument.

To apply the persecution bar to deny Diaz-Zanatta asylum or withholding of removal, the IJ must determine from the evidence in the record that during her employment with the Peruvian intelligence service, Diaz-Zanatta supplied information to the military that was actually used to persecute some individual or individuals, and that Diaz-Zanatta knew that the information she supplied would be used or was being used to persecute those individuals. It is not enough that information collected by Diaz-Zanatta and relayed by her to the SIE was used to persecute individuals if Diaz-Zanatta had no prior or contemporaneous knowledge of that; neither is it enough that Diaz-Zanatta knew that persecutions were taking place, if information Diaz-Zanatta collected and relayed to the military was not used in those persecutions.

---

[4]This might be overly broad. *See Hernandez v. Reno*, 258 F.3d 806, 813 (8th Cir. 2001) (noting that "[a]lthough it ruled that there was no condition of voluntariness in the provision, the Court indicated that all aspects relevant to an individual's conduct must be examined in order to determine whether he assisted in persecution").

[5]We note that the Supreme Court is considering whether the persecution bar applies to individuals who are compelled to assist or otherwise participate in the persecution of others. *Negusie v. Mukasey*, No. 07-499 (oral argument was held November 5, 2008). We do not expect the Court's decision to affect Diaz-Zanatta's case in a material way, however, because she has never argued that she was compelled to work for Peruvian intelligence. In fact, she testified that the reason she did not leave military intelligence earlier was because she had signed a seven-year contract.

## IV.  CONCLUSION

For the foregoing reasons, we **GRANT** Diaz-Zanatta's petition for review, **VACATE** the decision and orders of the IJ and BIA, and **REMAND** to the BIA for reconsideration and further proceedings consistent with this opinion.