**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2095**

NICOLAS R. PASTORA, a/k/a Nicholas Pastora-Hernandez,

        Petitioner,

     v.

ERIC H. HOLDER, JR., Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 17, 2013     Decided: December 11, 2013

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

Petition for review denied by published opinion. Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Floyd concurred.

**ARGUED:** William Robinson Heroy, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE, Charlotte, North Carolina, for Petitioner. Alison Marie Igoe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Principal Deputy Assistant Attorney General, Lyle D. Jentzer, Senior Counsel for National Security, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WYNN, Circuit Judge:

The issue on appeal is whether the evidence in this case is sufficient to require an applicant who is seeking relief from removal under the Nicaraguan Adjustment and Central American Relief Act ("NACARA") to bear the burden of proving that he did not engage in persecution in his home country. We hold that the record contains evidence sufficient to trigger the applicant's burden, and we agree with the Board of Immigration Appeals ("BIA") and the Immigration Judge ("IJ") that the applicant did not meet his burden. Accordingly, we deny the petition for review.

I.

Nicolas Rene Pastora-Hernandez ("Pastora") was born in El Salvador in 1941. He entered the United States illegally in 1986, was granted voluntary departure in 1988, and illegally reentered the United States in 1989. Pastora applied for asylum in 1991. The Immigration and Naturalization Service ("INS") granted Temporary Protected Status to Pastora, which expired at the end of 1994. Pastora again applied for asylum in 1995.

In his 1995 asylum application, Pastora wrote that he "served in the Civil Patrol unit" and that he was a commandant of his unit in his hometown (San Luis de la Reina). A.R. 327–28. Pastora also wrote: "[a]s head of my unit, I was an obvious

2

target for the guerrilla organization," and "I was persecuted and forced to leave my country by the guerillas." A.R. 327–28. In 1999, Pastora applied for special rule cancellation of removal under § 203 of NACARA, Pub. L. No. 105-100, 111 Stat. 2160, 2196 (1997). On his NACARA application, Pastora stated that if he were removed to El Salvador he "would face the possibility of being punished for not supporting the Civil War." A.R. 301.

In 2006, an officer with the United States Citizenship and Immigration Services ("USCIS")[1] interviewed Pastora in connection with his NACARA application. In response to a question about whether he had "ever served in the military or in the police" in El Salvador, Pastora answered that he had volunteered in the civil patrol for three hours per week for twelve years in San Miguel and in Sonsonate.[2] Pastora also stated that he had carried a knife in connection with his volunteer duties and that "the military would give firearms for a short period of time,

---

[1] USCIS is a division of the Department of Homeland Security ("DHS"). In 2003, DHS became responsible for the duties of the former Immigration and Naturalization Service ("INS"). See Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[2] Over the course of his interviews, Pastora gave conflicting accounts regarding the length of his service, which may have been as short as eight years or as long as eighteen years.

3

only while on duty." A.R. 354. Following this interview, USCIS informed Pastora that he "appeared to be barred from relief under section 240A(c)(5) of the Immigration and Nationality Act (persons who ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion)." A.R. 265.

In 2009, during an interview with a second asylum officer, Pastora reaffirmed his participation in the civil patrol, and he stated that his rank was "cabo," which was "above soldier but below sergeant." A.R. 358–59. Pastora testified that he was given weapons training, but he denied ever engaging in combat or seeing anyone arrested, harmed, or taken prisoner. He stated that he reported to "the commandante [sic] from the army in San Sonate [sic]" every weekend. A.R. 361.

In 2011, the IJ conducted a hearing during which he received into evidence two documents submitted by the Department of Homeland Security ("DHS") that "detail[ed] human rights violations" in the communities in El Salvador where Pastora lived and patrolled. A.R. 111, 114–15. The documents included a table that listed the names of victims and violators. The IJ also admitted a 2006 USCIS memo to the file that explained why USCIS found Pastora to be ineligible for special rule cancellation of removal.

4

The IJ then took testimony from Pastora, Pastora's son, and Pastora's wife. Pastora stated that he was part of an organization that protected the local community against guerillas. However, when he was asked to explain his duties, his rank, his length of service, and whether he carried a weapon or received training, Pastora gave testimony that conflicted with what he had previously told the asylum officers in his sworn statements. Pastora's lawyer acknowledged to the IJ that Pastora's testimony had "not been easy" and that Pastora had been inconsistent in both of his USCIS interviews. A.R. 179.

Upon consideration of the evidence, the IJ deemed Pastora barred from relief because he was unable to meet "his burden of proof to show that the persecutor bar to relief under NACARA does not apply." A.R. 90. Pastora appealed to the BIA. The BIA determined that Pastora's admitted participation in the civil patrol, coupled with the government's evidence of human rights violations that occurred during the time and in the place that Pastora patrolled, was sufficient to trigger Pastora's burden "to show by a preponderance of the evidence that the persecutor bar does not apply." A.R. 3. The BIA dismissed the appeal, finding no clear error in the IJ's adverse credibility determination and, under de novo review, a failure by Pastora to show "the inapplicability of the persecutor bar by a

5

preponderance of the evidence." A.R. 5. Pastora petitions this Court for review.

## II.

### A.

With his first argument on appeal, Pastora contends that the IJ and the BIA incorrectly determined that the persecutor bar applied and thus erred in requiring him to prove by a preponderance of the evidence that he did not engage in persecution. "When the BIA and the immigration judge both issue decisions in a case, we review both decisions upon appeal." Kourouma v. Holder, 588 F.3d 234, 239–40 (4th Cir. 2009). Here, the issues on appeal arise from the BIA's affirmance of the IJ's decision and its agreement with the reasoning in the IJ's decision. We review issues of law de novo, Mbea v. Gonzales, 482 F.3d 276, 279 (4th Cir. 2007), and factual findings under the substantial evidence standard, reversing only if the evidence compels a contrary finding, 8 U.S.C. § 1252(b)(4)(B).

Under NACARA,[3] certain nationals from Guatemala, El Salvador, and former Soviet bloc countries may apply for

---

[3] NACARA was enacted in 1997 and amended later that same year. It "amended the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which had amended the Immigration and Nationality Act (the 'INA') by rendering certain groups of aliens inadmissible." Barahona v. Holder, 691 F.3d 349, 350 n.1 (Continued)

6

suspension of deportation or special rule cancellation of removal.[4]  See NACARA § 203, 111 Stat. at 2196–99.  An applicant seeking cancellation of removal under NACARA bears the burden of establishing by a preponderance of the evidence that he meets all of the applicable requirements for relief.  8 C.F.R. §§ 1240.8(d), 1240.64(a).

A noncitizen who meets his burden under NACARA may nonetheless be ineligible for cancellation of removal due to the applicability of one of the mandatory bars contained in the Immigration and Nationality Act ("INA").  See 8 U.S.C. § 1229b(c) (listing six mandatory bars).  At issue in this case is the so-called persecutor bar, which renders ineligible for relief from removal any alien who the Attorney General decides "ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion[.]"  8 U.S.C. § 1231(b)(3)(B)(i).  "If the evidence indicates that [the persecutor bar] may apply, the

---

(4th Cir. 2012).  NACARA is codified in scattered sections of the United States Code, including Title 8.  Id.

    [4] Applicants whose deportation proceedings began before April 1, 1997, may apply for suspension of deportation.  8 C.F.R. § 1240.65.  Applicants whose removal proceedings began after April 1, 1997, may apply for special rule cancellation of removal.  Id. §§ 1240.65, 1240.66.

alien shall have the burden of proving by a preponderance of the evidence that [the persecutor bar] do[es] not apply." 8 C.F.R. § 1240.8(d).[5] As we stated in Higuit v. Gonzales, 433 F.3d 417 (4th Cir. 2006), "[i]f there is evidence that the alien engaged in persecution, he must prove by a preponderance of the evidence that he is not barred from relief on this ground." Id. at 420.

In this case, the administrative record contains Pastora's sworn statements that he served as a leader in a local civil patrol for as many as seventeen or eighteen years during the height of El Salvador's civil war. Starting in 1969, he worked two nights per week "trying to collect people for the army." A.R. 360. He received two months of training in 1983 regarding how to "let the military know where the guerrillas are." A.R. 360. Pastora was also given rifle training and a machete to take with him on his patrols. Sometimes the military provided him with firearms while he was on duty. He reported the results of his patrol to the military base on a weekly basis, and he

---

[5] The text of the regulation, 8 C.F.R. § 1240.8(d), includes the language "may apply", which may be in tension with the language of the statute, 8 U.S.C. §§ 1229b(c)(5), 1231(b)(3)(B), which requires that the attorney general "decide" that the alien engaged in persecution before the bar applies. We note that some of our sister circuits seem to have read the word "may" out of the regulation. See, e.g., Diaz-Zanatta v. Holder, 558 F.3d 450, 455 (6th Cir. 2009); Gao v. U.S. Att'y Gen., 500 F.3d 93, 103 (2d Cir. 2007); Singh v. Gonzales, 417 F.3d 736, 740 (7th Cir. 2005). We do not confront this issue today because ample record evidence indicates that the persecutor bar applies here.

walked "[p]eople that were taken to be soldiers" into town, where they were picked up and taken "to San Miguel by truck." A.R. 359. There is no evidence that he attempted to quit the patrol. Rather, Pastora testified that he served voluntarily in the two communities in which he lived until he left the country in 1986.

The record also contains evidence of numerous human rights abuses committed by armed groups associated with the military—local patrols such as Pastora's—in the area and during the years that Pastora admitted to patrolling for his unit. The "patrullas cantonales" were created in the early 1900s, and between 1967 and 1969 they were organized and expanded into a well-run militia force. These local patrols were pervasive throughout the country, and they served as the eyes and ears of the military and other paramilitary groups that were notorious for massive and widespread human rights abuses. The record contains a list of the names and ages of victims in Pastora's communities, as well as the dates that they were killed, disappeared, sexually assaulted, captured, or tortured.

By 1980, the military began to command and arm the members of the local groups with rifles, handguns, and machetes. In addition to assisting in the persecution carried out by the military and paramilitary groups, the local patrols were, themselves, directly responsible for numerous human rights

9

abuses. In 1983, for example, a local unit carried out the massacre of seventy Indian peasants in Sonsonate, the community to which Pastora had moved—and in which he continued patrolling—in 1982.

The totality of the specific evidence in this case was sufficient to indicate that the persecutor bar applied, requiring Pastora to prove by a preponderance of the evidence that he did not assist or otherwise participate in persecution.

B.

Next, we turn to the adverse credibility finding. The IJ found that Pastora was not credible "because of the cumulative effect of . . . inconsistencies, omissions and contradictions in [his] evidence." A.R. 91. The IJ went on to explain each of these inconsistencies, omissions, and contradictions at length, noting at one point that Pastora's confusing and contradictory testimony "appear[ed] to the Court to represent an attempt by [Pastora] to hide incriminating information." A.R. 92. The BIA upheld the IJ's determination in its entirety. On appeal, we review an adverse credibility determination to ensure that substantial evidence exists to support it. Djadjou v. Holder, 662 F.3d 265, 273 (4th Cir. 2011). Although we accord broad deference to a credibility finding, our deference is not absolute because the IJ must provide "specific, cogent reasons" to support an adverse credibility determination. Id.

10

Key to the adverse credibility finding in this case was Pastora's 1995 asylum application. In that application, Pastora stated twice that he had been a commandant in the civil patrol. Pastora later told an asylum officer and also the IJ that he was unaware that his application contained such statements, and he indicated that he depended on others to fill out the forms for him. The 1995 application also explained that Pastora was seeking asylum because there had been "too much killing" during the civil war and because the guerillas were looking for him and his family. A.R. 327.

Yet Pastora testified before the IJ that he was unaware of who the guerillas were and that he had not heard of any human rights abuses having occurred anywhere that he had patrolled. He also testified that he did not know who killed his brother and that he was unaware that his asylum application stated that the guerillas killed his brother and were looking for him and his family. These are only some examples of the many inadequately explained discrepancies in Pastora's statements over the course of his immigration proceedings.

The IJ was "left not knowing which of Respondent's accounts to believe, if any." A.R. 91. He listed several specific reasons explaining how the cumulative effect of the inconsistencies in Pastora's testimony led him to make the adverse credibility finding. The IJ thoroughly explained the

11

relevance of each inconsistency, noting that he was most troubled by the variety of responses that Pastora gave to questions about the training and weapons that he had received from the military while in the civil patrol. When he was asked to account for his different answers, Pastora denied that he had made certain statements, said that he did not remember making other statements, or changed his account of past events yet again.

We agree with the BIA that the record contains substantial evidence supporting the adverse credibility finding. We therefore must defer to that finding. Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004) ("We . . . defer to credibility findings that are supported by substantial evidence.").[6]


III.

For the foregoing reasons, we deny Pastora's petition for review.

PETITION DENIED

---

[6] Pastora argues that any material discrepancies should be attributed to his age, his illiteracy, or the length of time that has passed between his testimony and the events that occurred in El Salvador. However, the record contains no evidence that calls into question Pastora's capacity to testify truthfully or to recall past events. This unsupported argument thus fails.

12