PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2329

TOBIA ROMERO QUITANILLA,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 14, 2014                    Decided: July 14, 2014

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Petition for review denied by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Duncan joined.

**ARGUED:** Sam H. Hasan, HASAN LAW GROUP, Falls Church, Virginia, for Petitioner. Edward Earl Wiggers, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Principal Deputy Attorney General, Mary Jane Candaux, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

KING, Circuit Judge:

Petitioner Tobia Romero Quitanilla, a native of El Salvador, sought discretionary relief from removal by way of a special rule cancellation under the Nicaraguan Adjustment and Central American Relief Act of 1997 (the "NACARA").[1] An Immigration Judge (the "IJ") denied Quitanilla's request, ruling that he was ineligible for relief because of the "persecutor bar," codified at 8 U.S.C. § 1231(b)(3)(B)(i). On September 28, 2012, the Board of Immigration Appeals (the "BIA") denied relief and dismissed. Quitanilla petitions for our review of the BIA's dismissal. Discerning no error, we deny review.

I.

A.

Quitanilla entered the United States from El Salvador without inspection in March 1987. On June 6, 1988, Quitanilla applied for asylum, asserting that he feared persecution by guerilla forces should he return to El Salvador. Between 1989 and 2006, the federal immigration authorities interviewed Quitanilla on at least four occasions in connection with his asylum application and his separate request for special rule

---

[1] Although references in the record are inconsistent, we refer to the Petitioner as "Tobia Romero Quitanilla."

2

cancellation of removal under the NACARA. During the course of those interviews, Quitanilla acknowledged that he had served in the Salvadoran military from February 1982 until early 1987.[2] Quitanilla elaborated that, after he was discharged from the military, guerillas fighting for opposition forces in El Salvador came to his home seeking food and recruits, and asking for Quitanilla by name. On January 6, 2006, after his final asylum interview, the Department of Homeland Security (the "DHS") notified Quitanilla of its intent to deny his asylum application for failure to show that he had been persecuted or had a reasonable fear of persecution should he return to El Salvador.[3]

On April 3, 2006, the DHS sent Quitanilla a final notice of denial of his asylum application, advising that his case had been referred to the IJ for further proceedings. Accompanying the DHS letter was a notice to appear, charging Quitanilla with

---

[2] Although there is some dispute concerning the dates of Quitanilla's military service, that discrepancy does not bear on our analysis.

[3] Quitanilla initially filed his asylum application with the DHS's predecessor, the Immigration and Naturalization Service (the "INS"). The Homeland Security Act of 2002 abolished the INS and transferred its functions to the DHS. See Ivanov v. Gonzales, 487 F.3d 635, 637 n.2 (8th Cir. 2007). Because the INS has been abolished, we refer to the immigration agency as the DHS. The Attorney General is the proper respondent in petitions for review of BIA removal decisions. See 8 U.S.C. § 1252.

removability from the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), because he is "[a]n alien present in the United States who has not been admitted or paroled." J.A. 713.[4]

B.

The procedural background of this matter warrants further explanation. On August 11, 1999, Quitanilla filed an application for special rule cancellation of removal under the NACARA. Section 203 of the NACARA (as codified in 8 U.S.C. § 1229b(b)) authorized such a special rule cancellation for aliens who satisfy "certain criteria, including not being either 'inadmissible or deportable.'" See Barahona v. Holder, 691 F.3d 349, 351 (4th Cir. 2012) (quoting 8 U.S.C. § 1229b(b), (c)(4)).[5] As we have explained, "[a]n applicant seeking cancellation of removal under NACARA bears the burden of establishing by a preponderance of the evidence that he meets all of the applicable requirements for relief." Pastora v. Holder, 737 F.3d 902, 905 (4th Cir. 2013). Even if a NACARA applicant otherwise demonstrates that he satisfies the NACARA criteria, he may yet be ineligible for cancellation of removal if he falls

---

[4] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this matter.

[5] The NACARA, which was enacted in 1997 by Public Law 105–100, 111 Stat. 2160, 2193–96, and amended that year by Public Law 105–139, 111 Stat. 2644, is codified in various portions of the United States Code, including Title 8.

4

within one of six mandatory bars specified in 8 U.S.C. § 1229b(c). One of those six bars is the persecutor bar, found at 8 U.S.C. § 1231(b)(3)(B)(i), which provides that an alien is ineligible for special rule cancellation "if the Attorney General decides that" he "ordered, incited, <u>assisted, or otherwise participated in the persecution of an individual because of</u> the individual's race, religion, nationality, membership in a particular social group, or <u>political opinion</u>." (emphasis added). If "the evidence indicates that one or more of the grounds for mandatory denial of the application for relief" — such as the persecutor bar — "may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1240.8(d).

On December 6, 2001, a DHS officer interviewed Quitanilla in connection with his application for special rule cancellation of removal. During the interview, Quitanilla detailed his Salvadoran military service, explaining that he had been a sergeant in the Third Brigade, stationed in San Miguel, from approximately 1981 to 1984. From 1984 to 1987, Quitanilla served in the "Patrulla de Reconocimiento de Alcance Largo," also known as the "PRAL," a long range reconnaissance patrol stationed in Santa Ana. J.A. 654. In the PRAL, Quitanilla's duties included going "out in the villages and look[ing] for

5

guerillas or civilians who looked like guerillas or guerilla sympathizers." Id.

During his military service, Quitanilla "investigated and arrested about 50 guerillas and civilians who, in his opinion, were terrorists," many of whom were on lists of wanted terrorists provided by his superiors. Id. Quitanilla, acting on orders from his commanding officers, directed the "arrest [of] wanted terrorists." Id. Quitanilla denied that he had ever "interrogated or mistreated anyone," as "his mission was only to capture and deliver" those individuals to his superiors. Id. Quitanilla did not know what happened to his captives because they were always moved to other locations for interrogation. Quitanilla also participated in regular military operations and was involved in five or six combat encounters. Although Quitanilla fired military weapons during these skirmishes, he did not know that he had ever harmed anyone "because of the combat conditions and the distance." Id. Quitanilla said that he was "unaware that the military was involved in human rights abuses from 1981-1986," and denied "that he or his military unit harmed anyone." Id.

On December 7, 2001, based on this interview and other information available concerning human rights abuses by the PRAL and the Salvadoran military, the DHS officer determined that Quitanilla was a persecutor, and was therefore ineligible for a

6

special rule cancellation of removal. See J.A. 657. In so concluding, the officer decided that Quitanilla was "not credible with respect to his inconsistent and vague testimony denying knowledge of military activities and human rights," reasoning that

> [Quitanilla] was present in the areas documented as being areas where human rights abuses took place. It is highly unlikely that [Quitanilla] was not aware of and did not participate in persecutorial acts from 1981-1986. Moreover, [Quitanilla] admitted making about 50 arrests, in which he investigated and/or turned suspected guerillas over to his superiors. While [Quitanilla] denied knowing what happened to them once he gave the prisoners to his superiors, country conditions reports clearly indicate that the prisoners were then routinely interrogated, tortured and sometimes killed.

Id.[6] Thus, the DHS Officer resolved, Quitanilla had "engaged in persecutorial acts" and was ineligible for special rule cancellation of removal under the NACARA. Id.

C.

Pursuant to the April 2006 notice from the DHS, Quitanilla appeared for an initial IJ hearing in Arlington, Virginia, on

---

[6] The "country conditions reports" referred to by the DHS officer are also known as "Country Reports on Human Rights Practices," "Country Reports," or "Human Rights Reports," and are prepared by the Department of State. We have recognized that "[a] State Department report on country conditions is highly probative evidence," and "[r]eliance upon these reports makes sense because this inquiry is directly within the expertise of the Department of State." See Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999) (internal quotation marks omitted).

7

November 1, 2006. During the hearing, Quitanilla conceded removability, but maintained that he was nevertheless entitled to special rule cancellation of removal under the NACARA, seeking thereby to amend his NACARA application. On December 27, 2006, Quitanilla again appeared before the IJ and submitted an amended NACARA application. Quitanilla did not, however, renew his asylum application.

On March 15, 2007, the IJ conducted a hearing on Quitanilla's amended NACARA application. After considering Quitanilla's testimony and examining the record, the IJ denied by oral order Quitanilla's application for special rule cancellation of removal. See J.A. 584-92 (the "First IJ Decision"). In so ruling, the IJ evaluated evidence relating to Quitanilla's family, employment, and driving history in this country, as well as his earlier statements to the DHS. Quitanilla also provided the IJ with a DHS report containing a list of approximately 1200 persons who committed human rights violations during the Salvadoran civil war. Quitanilla was not on the DHS list, and relied on his absence therefrom as evidence exonerating him from participating in the persecution of others.

The IJ nevertheless determined that the persecutor bar applied and precluded special rule cancellation of removal because Quitanilla had been a "persecutor of others" and a "party to" torture during his service in the Salvadoran

8

military.  See First IJ Decision 7.  In explaining that ruling, the IJ found that Quitanilla's testimony concerning his role in the Salvadoran military was not credible, in that it contradicted his previous statements.  Specifically, the First IJ Decision found that Quitanilla had arrested guerillas and civilians who opposed the Salvadoran military, explaining as follows:

> It is the opinion of the Court that the testimony of [Quitanilla] with respect to the fact that he never arrested anybody in his position as a sergeant with the PRAL unit is not credible.  It is the opinion of the Court that [Quitanilla's] statement to the [DHS] officer that he did arrest between 20 and 50 people is the correct statement.

Id. at 5-6.  According to the IJ, "individuals could not have been tortured if information were not provided on those individuals and those individuals were not arrested and turned over to the people who do the torturing."  Id. at 7.

D.

Quitanilla appealed the First IJ Decision to the BIA.  On October 3, 2008, the BIA remanded the matter to the IJ.  See J.A. 518-19 (the "First BIA Decision").  The First BIA Decision directed that "any evidence relied on by the [IJ] be included in the record," and authorized the IJ to conduct a further hearing if "additional relevant evidence [was] submitted."  Id. at 2.  Although the IJ had referred to evidence "concerning the actions of the Third Brigade and PRAL as support for his finding that

9

[Quitanilla] assisted in the persecution of others," he failed to reference evidence to that effect. See id. (internal quotation marks omitted). The BIA specifically declined, however, to find error with respect to the IJ's assessment of Quitanilla's credibility. Thus, the IJ's finding that Quitanilla had "arrested between 20 and 50 people while he was a member of PRAL and transferred them to his superiors," was undisturbed. See id. at 1.

After the First BIA Decision remanded the matter to the IJ in 2008, he convened a hearing and considered additional evidence submitted by the DHS. On July 15, 2011, the IJ again denied Quitanilla's application for special rule cancellation of removal. See J.A. 62-65 (the "Second IJ Decision"). Specifically, the IJ concluded that the DHS had "carried its initial burden of providing evidence that indicate[d] the persecutor bar may apply." Id. at 3. He further concluded that Quitanilla "had not introduced evidence to counter" that submitted by the DHS. Id. at 4. In support of the Decision, the IJ also relied on the country reports for El Salvador during the relevant period (from 1981 to 1987), as well as other evidence of the PRAL's tactics and activities during the Salvadoran civil war. According to the 1983 country report, El Salvador "suffer[ed] from politically motivated violence engendered in part by continuing political polarization," and

10

extremists on both sides were "guilty of politically motivated civilian deaths as [were] some members of the Armed Forces." J.A. 338. As the IJ explained, "the evidence submitted by the Government contains a wide range of sources that show the widespread, prevalent violence on behalf of the Armed Forces of El Salvador ("FAES") and the government-sanctioned death squads." Second IJ Decision 3. The IJ further related that the PRAL had "been cited for many human rights abuses and killings," and the Third Brigade, of which Quitanilla was a part, had "many documented instances of human rights abuses." Id.

Importantly, the Second IJ Decision found that Quitanilla had "arrested individuals and turned them over to the brigade," and "likely understood that the individuals that he investigated or arrested would be tortured and killed." Id. Finally, the IJ emphasized that Quitanilla was a sergeant in the PRAL, and thus "responsible for leading units against guerillas and turning over individuals." Id. at 4. He therefore could not be deemed a mere soldier. As such, the IJ reasoned, Quitanilla's assertion that his participation in the PRAL did not rise to the level of genuine assistance to persecutors was unpersuasive.

Quitanilla also appealed the Second IJ Decision to the BIA, which, on September 28, 2012, dismissed the appeal. See J.A. 3-5 (the "Final BIA Decision"). After reciting the documented human rights abuses of the PRAL, the BIA again explained that

11

"even if [Quitanilla] committed no atrocities himself, [he] was aware that individuals he investigated or arrested would likely be tortured and killed by the FAES." Id. at 2. Accordingly, the BIA ruled, the IJ had correctly concluded that Quitanilla was barred from special rule cancellation of removal under the NACARA. The BIA declined to disturb its earlier ruling that there was no clear error in the First IJ Decision's "findings that [Quitanilla] did not testify credibly, and that he ordered the arrest and turnover of between 20 and 50 suspected terrorists to his superiors." Id.

Quitanilla has timely petitioned for our review of the Final BIA Decision. We possess jurisdiction pursuant to 8 U.S.C. § 1252.


II.

Where, as here, the BIA has adopted and supplemented an IJ decision, we must assess the rulings made by both the BIA and the IJ. See Barahona v. Holder, 691 F.3d 349, 353 (4th Cir. 2012). As we recognized in Barahona, appellate review of a BIA decision denying special rule cancellation of removal under the NACARA is circumscribed by the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(B)(i). See id.; see also Gonzalez-Ruano v. Holder, 662 F.3d 59, 63 (1st Cir. 2011). Pursuant to that jurisdictional statute, "a determination by the Attorney

12

General as to whether an alien satisfies the requirements of cancellation of removal is final and shall not be subject to review by any court." Barahona, 691 F.3d at 353 (internal quotation marks and punctuation omitted). Thus, we have no authority to "review discretionary determinations regarding requests for special rule cancellation of removal under NACARA, absent legal or constitutional error." Id. (internal quotation marks omitted). Despite these jurisdictional limitations, "a court of appeals has jurisdiction to review constitutional claims and questions of law arising from denials of relief under the NACARA." Id. We review de novo such questions of law. See Higuit v. Gonzales, 433 F.3d 417, 420 (4th Cir. 2006).

## III.

By his petition for review, Quitanilla maintains that the persecutor bar is inapplicable because he did not assist in the persecution of others and was merely a soldier following orders and participating in military activities. Quitanilla also asserts that the DHS failed to make the requisite prima facie showing that he assisted or otherwise participated in the persecution of individuals. As a result, he argues, the burden of proof should not have shifted to him in the IJ proceedings.

13

A.

Our sister circuits have identified two requirements for invocation of the persecutor bar — that is, "for deciding whether an alien's conduct amounts to assisting or participating in persecution." See Diaz-Zanatta v. Holder, 558 F.3d 450, 455 (6th Cir. 2009); Xu Sheng Gao v. United States Attorney Gen., 500 F.3d 93, 103 (2d Cir. 2007). First, as explained by the Sixth Circuit, "there must have been some nexus between the alien's actions and the persecution of others, such that the alien can fairly be characterized as having actually assisted or otherwise participated in that persecution." Diaz-Zanatta, 558 F.3d at 455. We must distinguish between "genuine assistance in persecution and inconsequential association with persecutors," and then determine whether the petitioner's conduct falls within the activities proscribed by the persecutor bar. See Singh v. Gonzales, 417 F.3d 736, 739 (7th Cir. 2005). The second requirement of the persecutor bar is that the petitioner must "have acted with scienter," or with "some level of prior or contemporaneous knowledge that the persecution was being conducted." Diaz-Zanatta, 558 F.3d at 455. Concerning the second requirement, "the evidence need not show that the alleged persecutor had specific actual knowledge that his actions assisted in a particular act of persecution." Xu Sheng Gao, 500 F.3d at 103. Application of the persecutor bar, however,

14

requires "some level of culpable knowledge that the consequences of one's actions would assist in acts of persecution." Id.

B.

In assessing the applicability of the persecutor bar, we accept the IJ's factual determinations. Our review of the Final BIA Decision is thus limited to the issue of whether, under the facts found — and credibility determinations made — by the IJ, Quitanilla assisted or otherwise participated in the persecution of individuals.

In evaluating the first requirement of the persecutor bar, it is undisputed that Quitanilla, as a sergeant in the PRAL, oversaw the investigation and capture of twenty to fifty civilians and guerillas. He then turned those captives over to his military superiors, where the prisoners were, according to the country reports, "routinely interrogated, tortured and sometimes killed." J.A. 657. On this record, evidence of the PRAL's human rights abuses during the Salvadoran civil war, including torture, kidnapping, and killing of guerillas and opponents of the Salvadoran military, is compelling uncontradicted. Although Quitanilla denies participating in such activities, his role in the persecution of twenty to fifty individuals cannot be deemed as "passive." As our sister circuits have recognized, those who take custody of or transport individuals for the purpose of persecution may be subject to the

15

persecutor bar. See Xie v. INS, 434 F.3d 136, 143 (2d Cir. 2006) (transporting "captive women to undergo forced abortions was assistance in persecution" precluding eligibility for asylum); Singh, 417 F.3d at 740 (taking "innocent Sikhs into custody" and "transport[ing] them to the police station, where [petitioner] knew they would be subjected to unjustified physical abuse," constituted assistance in prohibited persecution).

We turn to the persecutor bar's second requirement — that the petitioner "acted with scienter." Based on the abuses by the PRAL and, specifically, by the Third Brigade, the IJ found that Quitanilla "most likely understood that the individuals he investigated or arrested would be tortured and killed." Second IJ Decision 3. We are unable to disturb the IJ's factual findings in that regard, and we must accept his adverse assessment of Quitanilla's credibility. Moreover, we have recognized that "information-gathering and infiltration," which "led to the torture, imprisonment, and death of . . . political opponents, as well as individuals merely suspected of affiliation with these groups," constitutes sufficient assistance in the persecution of individuals on the basis of political opinion to trigger application of the analogous persecutor bar in the asylum context. See Higuit v. Gonzales,

433 F.3d 417, 421 (4th Cir. 2006).[7] There, although petitioner Higuit did not "personally inflict[] physical harm," he was nevertheless barred from asylum relief because his intelligence activities led directly to the persecution of his political opponents. Id. at 418. As we explained, "while the commission of actual physical harm may be sufficient to bring an alien within the persecution exception, it is not necessary." Id. at 421. In these circumstances, Quitanilla's conduct facilitated the persecution of guerillas and civilians. The BIA thus did not err in concluding that the persecutor bar renders Quitanilla ineligible for special rule cancellation of removal under the NACARA.

## C.

Quitanilla counters with other unavailing contentions. First, he posits that, because a petitioner's mere participation in a civil war is insufficient to trigger the persecutor bar, his military involvement with the PRAL does not make him ineligible for NACARA relief. Quitanilla supports those arguments with our recent decision in Pastora v. Holder, 737 F.3d 902 (4th Cir. 2013), asserting that we upheld application

---

[7] The Higuit decision largely concerned the scope of the nearly identical persecutor bar found in 8 U.S.C. § 1158(b)(2)(A)(1), which applies to an alien seeking asylum. See 433 F.3d at 418.

17

of the persecutor bar to a petitioner who "was found to have assisted the . . . same guerillas that [Quitanilla] is charged with persecuting." Br. of Petitioner at 19. Thus, Quitanilla maintains, denying him a special rule cancellation of removal would "essentially leave NACARA relief an unattainable benefit" to a Salvadoran citizen "because nearly every person in El Salvador in the eighties assisted either the rebels or the government in some small way." Id. He contends that the persecutor bar should not be read so expansively as to "preclude entire classes of legitimate asylum seekers from safe harbor, notably those involved in civil strife." See Vukmirovic v. Ashcroft, 362 F.3d 1247, 1252-53 (9th Cir. 2004). Unfortunately for Quitanilla, this argument is undermined by the facts that were explicitly found by the IJ. The IJ declined to view Quitanilla as a mere participant in the Salvadoran civil war. Rather, he found Quitanilla to be a sergeant in the Salvadoran military who oversaw the investigation and capture of his adversaries, and who then transferred his captives to a military unit with a record of human rights abuses. We are unable to disturb those findings by the IJ, and they belie Quitanilla's argument that he was simply a passive soldier in the Salvadoran military.[8]

---

[8] Quitanilla also contends that his absence from the DHS (Continued)

18

Quitanilla also challenges the IJ's application of the burden-shifting framework to the evidence of record, maintaining that the IJ erred in deciding that the DHS had satisfied its prima facie burden of showing Quitanilla's involvement in the persecution of others.  As the immigration regulations require, an applicant for relief from removal bears the initial burden of "establishing that he or she is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion."  8 C.F.R. § 1240.8(d).  If, however, "the evidence indicates that one or more of the grounds for mandatory denial of the application for relief" — such as the persecutor bar — "may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."  Id.  In light of the IJ's findings relating to human rights abuses committed by the PRAL and Quitanilla's role in the Salvadoran military, the IJ did not err in ruling that the persecutor bar could be applied.  As a result, the burden of proof was properly shifted to Quitanilla to show the inapplicability of the persecutor bar by a preponderance of the evidence.  Quitanilla's failure in that regard undermines his

list of known human rights violators establishes that he did not assist in the persecution of other individuals.  Inasmuch as this challenge presents a factual issue, we lack jurisdiction to address it.

19

petition for review.[9]  In sum, we are satisfied that the BIA did not err in ruling that Quitanilla, during his service in the Salvadoran military, assisted in the persecution of individuals because of their political views.

IV.

Pursuant to the foregoing, we deny Quitanilla's petition for review.

PETITION FOR REVIEW DENIED

---

[9] Finally, Quitanilla contends that the IJ, in the context of both of the IJ decisions, "clearly abused his discretion and that abuse rose to the level of a due process violation."  Br. of Petitioner at 32.  Quitanilla, however, offers no support for such a claim, nor are we able to discern any support from the record.

20